No. 22-10889

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**In the Matter of Highland Capital Management, L.P.,**

**Debtor.**

JAMES DONDERO, Defendant in the above captioned adversary proceeding and a creditor, indirect equity holder, and party in interest in the above-captioned bankruptcy case,
APPELLANT

v.

HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff in the above-captioned adversary proceeding and the Debtor in the above-captioned bankruptcy case,
APPELLEE[1]

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, HON. DAVID GODBEY
CASE NO. 3:21-cv-01590-N

## ANSWERING BRIEF OF APPELLEE

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd.
Los Angeles, CA 90067
(310) 277-6910

HAYWARD PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Appellee*

---

[1] Appellee has adopted Appellant's self-serving description of himself as required by Fed. R. App. P. 32, but objects because the description is (a) factually incorrect (Appellant is *not* a "creditor" or an "indirect equity holder" in Highland, and arguably is not even a "party in interest" today), (b) inconsistent with the caption used in the Bankruptcy Court and District Court, and (c) irrelevant to the issues on appeal.

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that:

(a)    There are no other debtors associated with this bankruptcy case other than Highland Capital Management L.P., and there are no publicly-held corporations that own 10% or more of Appellee Highland Capital Management L.P., which is not a corporation and which is not a parent corporation;

(b)    That the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.    **Defendant - Appellant:**
      **James Dondero**

      Counsel for Defendant - Appellant:

      LEVINGER PC
      Jeffrey S. Levinger
      J. Carl Cecere
      1700 Pacific Ave., Suite 2390
      Dallas, TX 75201

2.    **Appellee (Debtor):**
      **Highland Capital Management, L.P.**

      Counsel for Appellee:

      PACHULSKI STANG ZIEHL & JONES LLP
      Jeffrey N. Pomerantz
      10100 Santa Monica Blvd., 13th Floor
      Los Angeles, CA 90067
      Telephone: (310) 277-6910

2

PACHULSKI STANG ZIEHL & JONES LLP
John A. Morris
Gregory V. Demo
Hayley R. Winograd
780 Third Avenue, 34th Floor
New York NY 10017-2024
Tel: (212) 561-7700

HAYWARD PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Roy T. Englert, Jr.
Matthew M. Madden
Shikha Garg
2000 K Street NW, 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500

**HAYWARD PLLC**

*/s/Zachery Z Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

Appellee respectfully submits that oral argument is unlikely to aid the Court in resolving the questions presented because (a) the appeal plainly lacks merit, (b) no novel or unusual issues are raised, and (c) the parties' briefs will more than adequately argue the parties' positions.

DOCS_NY:47117.2 36027/003

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

ISSUES PRESENTED...........................................................................1

SUMMARY OF ARGUMENT ...........................................................2

STATEMENT OF THE CASE............................................................5

    A.    Case Background......................................................................5

        1.    The Bankruptcy Proceedings ......................................5

        2.    The Shared Services Arrangements............................7

        3.    The CLOs.....................................................................8

    B.    The Bankruptcy Court Issues the TRO ...............................9

    C.    Dondero's Post-TRO Conduct ............................................11

        1.    Dondero Interfered with Highland's Sale of CLO Assets.......11

        2.    Dondero Communicated with Highland Employees About Matters Other Than "Shared Services".........................12

    D.    The Contempt Proceedings .................................................13

    E.    The Contempt Order.............................................................16

        1.    Dondero Violated the Shared Services Exception under Section 2(c) ...................................................17

        2.    Dondero Violated Section 3(a) by Interfering with Highland's Sales .................................................19

        3.    The Sanctions Award.................................................20

    F.    The District Court Affirms Virtually All of the Contempt Order......20

    G.    Dondero Files the Instant Appeal......................................21

ARGUMENT ...................................................................................22

    A.    Standard Of Review .............................................................22

    B.    Section 2(c) of the TRO Complies with Rule 65 ...............23

        1.    Section 2(c) Is Sufficiently Specific under Rule 65(d)(1)(B) .................................................23

DOCS_NY:47117.2 36027/003

2.      Section 2(c) Describes in Reasonable Detail the
        Prohibited Conduct Without Reference to Outside
        Documents in Compliance with Rule 65(d)(1)(C) .................27

C.      The Bankruptcy Court's Finding That Dondero Violated
        Section 2(c) pf the TRO by Communicating with Highland
        Employees About Matters Outside the Shared Services
        Exception Was Not Clearly Erroneous ..............................................33

D.      The Bankruptcy Court's Finding That Dondero Violated
        Section 2(d) of the TRO by Interfering with Highland's Post-
        TRO Securities Trades Was Not Clearly Erroneous..........................36

E.      The Bankruptcy Court's Sanction Award Was Not an Abuse of
        Discretion ........................................................................................40

        1.      The Bankruptcy Court Properly Exercised Its Discretion
                in Awarding Fees Relating to the Contempt Motion...............41

        2.      The Bankruptcy Court's Factual Findings Supporting Its
                Fee Award Were Not Clearly Erroneous.................................44

CONCLUSION ....................................................................................47

DOCS_NY:47117.2 36027/003

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Agency for Int'l. Dev. v. All. for Open Soc'y Int'l., Inc.,*
    140 S. Ct. 2082 (June 29, 2020) ...........................................................35

*All. for Open Soc'y Int'l., Inc. v. U.S. Agency for Int'l. Dev.,*
    911 F.3d 104 (2d Cir. 2018) ................................................................34

*Am. Airlines, Inc. v. Allied Pilots Ass'n,*
    228 F.3d 574 (5th Cir. 2000) .......................................................... passim

*Am. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO,*
    No. 4:19-CV-414-A, 2019 WL 3774501 (N.D. Tex. Aug. 12, 2019) .................25

*Butler Aviation Int'l v. Whyte (In re Fairchild Aircraft Corp.),*
    6 F.3d 1119 (5th Cir. 1993) ................................................................22

*Davis v. City and Cnty. of San Francisco,*
    890 F.2d 1438 (9th Cir. 1989) ..............................................................33

*FDIC v. LeGrand,*
    43 F.3d 163 (5th Cir. 1995) ................................................................36

*Goodyear Tire & Rubber Co. v. Haeger,*
    137 S. Ct. 1178 (2017) ......................................................................44

*Gulf King Shrimp Co. v. Wirtz,*
    407 F.2d 508 (5th Cir. 1969) ..............................................................28

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ................................................................... 44, 45

Hernandez v. Hill Country Tel. Coop., Inc.,
    849 F.2d 139 (5th Cir. 1988) ......................................................... 45, 46

*Hill v Washburne,*
    953 F.3d 296 (5th Cir. 2020) ..............................................................31

*IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,*
    136 F.3d 537 (7th Cir. 1998) ..............................................................32

*In re Fabricators, Inc.,*
    926 F.2d 1458 (5th Cir. 1991) .............................................................22

*In re Martin,*
    963 F.2d 809 (5th Cir. 1992) ..............................................................39

*In re Timmons*,
   607 F.2d 120 (5th Cir. 1979) ...............................................................28

*Ingalls v. Thompson (In re Bradley)*,
   588 F.3d 254 (5th Cir. 2009) ............................................. 22, 26, 38, 39

*Islander E. Rental Program v. Barfield*,
   145 F.3d 359 (5th Cir. 1998) ...............................................................29

*Louis W. Epstein Family P'ship v. Kmart Corp.*,
   13 F.3d 762 (3d Cir. 1994) ..................................................................32

*Martin's Herend Imps., Inc. v. Diamond & Gem Trading U.S.A. Co.*,
   195 F.3d 765 (5th Cir. 1999) ...............................................................27

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949) ............................................................................28

*McVay v. Halliburton Energy Servs., Inc.*,
   608 F. App'x 222 (5th Cir. 2015) ........................................................27

*Meyer v. Brown & Root Constr. Co.*,
   661 F.2d 369 (5th Cir.1981) ................................................................24

*Payne v. Univ. of S. Miss.*,
   681 F. App'x 384 (5th Cir. 2017) ........................................................49

*Petroleos Mexicanos v. Crawford Enters., Inc.*,
   826 F.2d 392 (5th Cir. 1987) ...............................................................36

*Placid Ref. Co. v. Terrebonne Fuel & Lube, Inc.*
   *(In re Terrebonne Fuel & Lube, Inc.)*,
   108 F.3d 609 (5th Cir.1997) ......................................................... 22, 42

*Robertson v. Dennis (In re Dennis)*,
   330 F.3d 696 (5th Cir. 2003) ...............................................................42

*Roussell v. Brinker Int'l, Inc.*,
   441 F. App'x 222 (5th Cir. 2011) ........................................... 43, 45, 46

*Saenz v. Gomez (In re Saenz)*,
   899 F.3d 384 (5th Cir. 2018) ...............................................................39

*Saizan v. Delta Concrete Prods. Co., Inc.*,
   448 F.3d 795 (5th Cir 2006) ................................................................43

*Schermerhorn v. Centurytel, Inc. (In re Skyport Glob. Commc'ns, Inc.)*,
   No. 08-36737-H4-11, 2013 WL 4046397
   (Bankr. S.D. Tex. Aug. 7, 2013) ................................................. passim

iv

*Scott v. Schedler*,
    826 F.3d 207 (5th Cir. 2016) ..............................................................31

*Seattle-First Nat'l Bank v. Manges*,
    900 F.2d 795 (5th Cir. 1990) ..............................................................32

*Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*,
    486 F.2d 114 (5th Cir. 1973) ..............................................................29

*Thomas v. Cnty. of Los Angeles*,
    978 F.2d 504 (9th Cir. 1992), *as amended* (Feb. 12, 1993) ................33

*Topalian v. Ehrman*,
    3 F.3d 931 (5th Cir. 1993) ..................................................................48

*U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*,
    575 F.3d 458 (5th Cir. 2009) ..............................................................46

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) ...........................27

*Von Clark v. Butler*,
    916 F.2d 255 (5th Cir. 1990) ..............................................................43

*Wegner v. Standard Ins. Co.*,
    129 F.3d 814 (5th Cir. 1997) ........................................................ 43, 48

*Whitehead v. Food Max of Miss., Inc.*,
    332 F.3d 796 (5th Cir. 2003) ..............................................................23

## STATUTES

11 U.S.C. § 362(a) ...................................................................................10

## RULES

Fed. R. Civ. P. 65(d)(1) ...........................................................................23

Fed. R. Civ. P. 65(d)(1)(B) ......................................................................27

Fed. R. Civ. P. 65(d)(1)(C) ................................................................ 28, 32

v

## ISSUES PRESENTED

1. Whether Section 2(c) of the TRO complied with Rule 65(d) of the Federal Rules of Civil Procedure by putting the enjoined party, Dondero, on fair notice that his communications with Highland employees about matters unrelated to "shared services," including matters adverse to Highland, would violate Section 2(c)?

2. Whether the Bankruptcy Court's finding that Dondero violated Section 2(c) of the TRO should be affirmed as not clearly erroneous, where such finding was supported by documentary evidence proving that Dondero communicated with Highland employees about matters unrelated to "shared services" and that were adverse to Highland?

3. Whether the Bankruptcy Court's finding that Dondero violated Section 2(d) of the TRO by interfering with Highland's trading should be affirmed as not clearly erroneous, where such finding was supported by, *inter alia*, Dondero's admissions that he interfered with Highland's trading after the entry of the TRO?

4. Whether the Bankruptcy Court properly exercised its discretion in imposing a monetary sanction of $450,000 where the sanction was based on (i) invoices reflecting the attorneys' fees Highland incurred in connection with the Contempt Motion, and (ii) the Bankruptcy Court's conservative estimate of Highland's additional costs and expenses incurred through the date of the contempt hearing?

## <u>SUMMARY OF ARGUMENT</u>

I.     Section 2(c) of the TRO, which enjoined Dondero from communicating with Highland employees except as it related to "shared services," complied with Rule 65(d) because it put Dondero on fair notice of the prohibited conduct. Dondero, Highland's long-time chief executive officer, knew what "shared services" were, and, in fact, personally defined "shared services" throughout this proceeding. Section 2(c) did not require Dondero to reference outside documents to understand its scope and therefore also complied with Rule 64(d)(1)(C). If Dondero had actually been confused about the conduct prohibited by Section 2(c), he should have sought clarification from the Bankruptcy Court. Dondero cannot now claim he was uncertain as to the meaning of Section 2(c) in order to escape a contempt finding—particularly where the surreptitious communications at issue were all directly adverse to Highland's interests.

II.     The Bankruptcy Court's finding that Dondero violated Section 2(c) of the TRO was not clearly erroneous. The Bankruptcy Court relied on substantial documentary and testimonial evidence proving that Dondero repeatedly communicated with Highland employees about various matters that plainly fell outside "shared services" and were adverse to Highland's interests. These secret, written communications included Dondero: (a) soliciting the assistance of Highland employees to procure a witness to testify *against Highland*, (b) requesting

2

Highland's then-general counsel to show "leadership" in coordinating the attorneys representing Dondero's interests *against Highland*, and (c) colluding with Highland employees on a "common interest agreement" *against Highland*, among other conniving conduct.  This conduct blatantly violated the TRO, which was issued to protect Highland from Dondero's harmful conduct.

III.    The Bankruptcy Court's finding that Dondero interfered with Highland's trading activity after entry of the TRO also does not constitute clear error. This finding was supported by, among other things, the Bankruptcy Court's credibility determinations concerning Dondero's conflicting sworn testimony.  In rejecting Dondero's testimony that he did not interfere with those trades, the Bankruptcy Court properly exercised its discretion and relied on Dondero's prior unambiguous testimony in which he baldly admitted to interfering with trades after the TRO was issued.

IV.    Finally, the Bankruptcy Court also properly exercised its discretion by awarding $450,000 in sanctions.  The sanction award properly included fees incurred for services performed in support of the contempt motion, regardless of which alleged acts ultimately gave rise to contempt.  The conduct that was held to be non-contemptuous was so interrelated with the contemptuous conduct that strict segregation of fees would have been impossible.  The Bankruptcy Court's assessment of the reasonableness of Highland's fees, based on detailed records

3

submitted by Highland and the Bankruptcy Court's conservative estimates, was also

not clearly erroneous.

## STATEMENT OF THE CASE[2]

### A.     Case Background

#### 1.     The Bankruptcy Proceedings

James Dondero ("Dondero") is a co-founder of Highland.  On October 16, 2019, Dondero caused Highland, a multibillion-dollar global investment advisor, to file a voluntary petition for bankruptcy under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case"). ROA.6629-30. Highland was forced into bankruptcy by the "myriad of massive, unrelated, business litigation claims that it faced . . . after a decade or more of contentious litigation in multiple forums all over the world." ROA.6632.

The office of the United States Trustee and Highland's Official Committee of Unsecured Creditors (the "Committee") expressed doubts about Dondero's ability to act as an estate fiduciary given his history of self-dealing, fraud, and other misconduct. To avoid the appointment of a chapter 11 trustee, the Committee, Highland, and Dondero agreed to a corporate governance settlement on January 9, 2020 (the "Governance Settlement"). ROA.6635. Pursuant to the Governance Settlement, Dondero relinquished control of Highland and resigned from his position as Highland's CEO but remained at Highland as an unpaid employee and portfolio

---

[2] Citations to "ROA" are to the Record on Appeal.

DOCS_NY:47117.2 36027/003

manager. ROA.6630, ROA.6921.  Three independent directors were appointed to govern Highland (the "Independent Board"). ROA.6636, ROA.254-55.  In July 2020, one of the members of the Independent Board, James P. Seery, Jr. ("Seery"), was appointed Highland's Chief Executive Officer and Chief Restructuring Officer. ROA.6636.

Tensions thereafter arose between Dondero and Highland as Highland began resolving claims and formulating a proposed plan of reorganization.  For example, Dondero opposed certain actions taken by Seery and the Independent Board by, among other things, (a) objecting to a settlement between Highland and one of its creditors, Acis (owned by one of Dondero's long-time adversaries), and (b) directing one of his family trusts, The Dugaboy Investment Trust ("Dugaboy"), to file a proof of claim alleging Highland's mismanagement of a subsidiary's assets during the Bankruptcy Case. ROA.263, ROA.6922-23.

Highland's Independent Board determined that Dondero's actions created conflicts of interest between Dondero and Highland that made it untenable for Dondero to remain an employee of Highland. ROA.256, ROA.7003.  The Independent Directors demanded Dondero's resignation, and (as required by the Governance Settlement) Dondero resigned on October 9, 2020. ROA.7003.

6

2.    **The Shared Services Arrangements**

Although he resigned from Highland in October 2020, Dondero continued to own and control numerous non-Debtor[3] entities that were part of the Highland complex prior to the Bankruptcy Case but that were still "very much intertwined with Highland." ROA.256. Those entities included NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors"). Each Advisor is a registered investment advisor that manages publicly traded mutual funds (the "Funds"). Historically, Highland has, through its own employees, provided back- and middle-office services, or "shared services," to the Advisors pursuant to certain shared services agreements (the "Shared Services Agreements").[4] *Id.* These shared services included, *inter alia*, IT support, legal and accounting services, office space, and other overhead. *Id.*

"Shared services" is a commonly used term in investment management with a widely understood meaning. Dondero himself has testified on numerous occasions that he understood the meaning of the term "shared services":

- "[A]s is typical of subsidiaries in the financial services industry, the Advisors shared many services and personnel with Highland under an arrangement that was formalized in two different Shared Services Agreements," and that such

---

[3] "Debtor" is used interchangeably with "Highland" throughout this brief.

[4] Neither Dondero nor Dugaboy ever entered into a Shared Services Agreement with Highland.

"Back- and Middle-Offices" services included "finance and accounting," "operations," "bookkeeping," and "telecom" (Br. at 5) (citing ROA.8632-33, ROA.8651));

- NexPoint "used to have zero, zero of its own accountants and lawyers," and that "by shared services, [ ] NexPoint [ ] would use Highland's lawyers and accountants without the need of having to hire their own," further explaining that "in financial services, there's … generally a centralized model for high-cost people in the legal, accounting, and tax arena so that each subsidiary doesn't have to have their own expensive, duplicative set of employees." (ROA.10056-58);

- The shared services allowed Highland and the Advisors to share and coordinate "systems, servers, software . . . accounting, and legal functionality [that] are all part of the shared services agreement, although . . . much of that was stripped, you know, four or five months ago, especially legal functionality and the accounting functionality . . . ." (ROA.8093-100).

### 3.    **The CLOs**

The Funds managed by the Advisors hold, among other assets, interests in collateralized loan obligations ("CLOs"). ROA.258.  Highland manages the CLOs through portfolio management agreements that authorize Highland to, among other things, sell the CLOs' assets.  The Advisors are not parties to Highland's portfolio management agreements and have no right to manage the CLOs; they simply purport to act on behalf of certain investors, including the Funds and other non-Debtor, Dondero-related entities such as The Charitable DAF HoldCo, Ltd. (the "DAF") and CLO Holdco, Ltd. ("CLOH"). *See* ROA.7351-52.

## B.    <u>The Bankruptcy Court Issues the TRO</u>

After his resignation in October 2020, Dondero began interfering with Highland's operations and wind-down of its business by, among other things, obstructing the sale of securities and threatening Highland's CEO, Seery.  In late November 2020 Seery authorized the CLOs to sell certain securities with the tickers "SKY" and "AVYA." ROA.7027. On November 24, 2020, email communications detailing those planned sales were forwarded to Dondero. ROA.7012. In response, Dondero instructed an HCMFA employee and a Highland employee not to effectuate those sales. *Id.*; *see also* ROA.7026 (another November 24 email from Dondero instructing that the sales not be completed).  After Dondero was informed that a small amount of the sales had been completed but the balance were canceled, Dondero replied, "don't do it again please." ROA.7011-12. On December 3, 2020, Dondero sent a text message to Seery regarding these sales, stating: "Be careful what you do—last warning." ROA.266, ROA.7519 (vol. 28); *see also* ROA.7702 at 62:19-63:22.[5]

In response to Dondero's threats and interference, on December 7, 2020, Highland moved for a temporary restraining order ("<u>TRO</u>") and preliminary

---

[5] Dondero also issued a not-so-subtle threat to Thomas Surgent, the Debtor's Chief Compliance Officer, "remind[ing]" him that he faced "personal liability" for carrying out trades "that contradict investor desires and [in Dondero's personal view] have no business purpose or investment rationale." ROA.7117.

9

injunction against Dondero, seeking to enjoin Dondero from, among other things, (i)

interfering with, controlling, or influencing the Debtor's business, management, and

disposition of assets, (ii) threatening or intimidating the Debtor or any of its agents

or employees, and (iii) otherwise violating Section 362(a) of the Bankruptcy Code.

ROA.6815-19.

Following a lengthy hearing on December 10, 2020, the Bankruptcy Court

issued the TRO to prevent "immediate and irreparable harm" to the Debtor pending

the hearing on the preliminary injunction. ROA.6873-75, ROA.9297.  Section 2 of

the TRO enjoined Dondero from:

> (a) communicating (whether orally, in writing, or otherwise), directly or
> indirectly, with any Board member unless Mr. Dondero's counsel and counsel
> for the Debtor are included in any such communication;
>
> (b) making any express or implied threats of any nature against the Debtor or
> any of its directors, officers, employees, professionals, or agents;
>
> (c) communicating with any of the Debtor's employees, except as it
> specifically relates to shared services currently provided to affiliates owned
> or controlled by Mr. Dondero (the "Shared Services Exception");
>
> (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's
> business, including but not limited to the Debtor's decisions concerning its
> operations, management, treatment of claims, disposition of assets owned or
> controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan;
> and
>
> (e) otherwise violating Section 362(a) of the Bankruptcy Code (collectively,
> the "Prohibited Conduct").

ROA.6874-75.  Section 3 of the TRO further enjoined Dondero from "causing,

encouraging, or conspiring with (a) any entity owned or controlled by him, and/or

10

(b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct." ROA.6875.

On December 16, 2020, Dondero moved to modify Section 2(a) of the TRO to allow him to communicate with the Independent Board about Dondero's proposed "pot plan" of reorganization, but he quickly withdrew the motion without explanation. *See* Adversary Proc. No. 20-3190-sgj, Docket Nos. 24, 28, and 29. Dondero never sought to modify or clarify any other provision of the TRO, including Section 2(c) pertaining to the Shared Services Exception.

## C.    **Dondero's Post-TRO Conduct**

Following the TRO, Dondero continued to interfere with Highland's business and management of assets, including by (a) communicating with Highland's employees about matters other than shared services; (b) interfering with Highland's sale of CLO assets; and (c) engaging in other conduct that was detrimental to Highland.  Dondero's post-TRO conduct is summarized below.

### 1.    **Dondero Interfered with Highland's Sale of CLO Assets**

Dondero violated the TRO by continuing to interfere with Highland's sale of CLO assets.  On December 18, 2020, Seery ordered the sale of certain CLO assets, including additional SKY and AVYA securities. ROA.7641-42. An HCMFA employee immediately informed Dondero of Seery's orders. ROA.7641.

When presented with those December emails at a hearing on January 8, 2021, Dondero candidly admitted that after learning of Seery's orders, he instructed Advisor employees not to execute those sales. *See* ROA.7708 at 89:21-25; ROA.8044 at 73:2-13; ROA.8062 at 76:6-19 (Dondero admitting to intervening in sales Seery had authorized and "personally instruct[ing] the employees of the Advisors not to execute the very trades that Mr. Seery identif[ied] in [the December 18 email]").

## 2. **Dondero Communicated with Highland Employees About Matters Other Than "Shared Services"**

Dondero also violated Section 2(c) of the TRO by covertly communicating with several Highland employees—including its then-General Counsel (Scott Ellington) and then Assistant General Counsel (Isaac Leventon), each of whom owed fiduciary duties to the Debtor—about matters outside of the Shared Services Exception that were directly adverse to Highland's interests.[6]

On December 12, 2020, just two days after the TRO was entered, Dondero solicited Ellington to identify a Highland employee who would testify against Highland at an upcoming hearing. *See* ROA.7666.   A few days later, Dondero, Ellington, and Leventon collaborated with Dondero's attorneys to prepare a

---

[6] Highland terminated Ellington and Leventon promptly after discovering the surreptitious communications, none of which were disclosed to Seery, any member of the Independent Board, or Highland's outside counsel.

"common interest" agreement. *See* ROA.7668-69, ROA.7715-16 at 116:21-120:14. Dondero also solicited Ellington's help in coordinating the myriad lawyers representing Dondero's interests, telling Ellington, "I'm going to need you to provide leadership here," to which Ellington replied, "[o]n it." ROA.7668. On December 23, 2020, Ellington and Grant Scott—Dondero's childhood friend and the longtime trustee of the DAF and CLOH—communicated to schedule a call with Dondero and counsel for the Advisors and Funds (K&L Gates). ROA.7683. On December 24, 2020, Dondero wrote to Ellington regarding Dondero's intent to object to a settlement between Highland and another of its creditors, HarbourVest. ROA.7182. In late December, Dondero communicated with Leventon to obtain the contact information for Ellington's and Leventon's new lawyers at Baker & McKenzie for the express purpose of advancing the "mutual shared defense agreement." ROA.7673, ROA.7720-21 at 136:8-139:5.

## D.    **The Contempt Proceedings**

On January 7, 2021, Highland moved for an order requiring Dondero to show cause why he should not be held in civil contempt for violating the TRO (the "Contempt Motion"). ROA.7186-90. In support of the Contempt Motion, Highland alleged that Dondero violated the TRO in various ways, including:

> (a) communicating with Ellington and Leventon (before they were terminated from Highland) to coordinate various parts of his legal strategy against Highland;

(b) interfering with trades of CLO assets that were authorized by Seery;

(c) encouraging the Advisors to make further spurious demands and threats against Highland regarding the trading of CLO assets;

(d) trespassing on Highland's property by entering Highland's offices following his eviction; and

(e) throwing his Highland-furnished cellphone in the garbage after cleaning all data in an attempt to evade discovery.

ROA.267-68.

On March 22 and 24, 2021, the Bankruptcy Court held an evidentiary hearing on the Contempt Motion (the "Contempt Hearing") during which it admitted substantial evidence into the record and heard testimony, including, *inter alia*, (a) Dondero's testimony that enabled the court to assess his credibility, and (b) documentary evidence, such as emails, text messages, and other communications proving that Dondero violated the TRO by (i) colluding with Highland employees—including Ellington and Leventon—to coordinate their legal strategy against Highland; (ii) communicating with other Highland employees about matters outside of the Shared Services Exception; and (iii) interfering with Highland's trading activity.

During the hearing, Dondero admitted to communicating with Ellington and Leventon after the TRO was issued on the matters described in the Contempt Motion. *See* ROA.10002 at 102:17-25; ROA.10035-36 at 135:5-136:5. Although Dondero claimed that the communications either fell within the Shared Services

14

Exception or were otherwise permitted because Ellington allegedly served as "settlement counsel," ROA.10002 at 102:17-25; ROA.10070 at 170:3-9; ROA.9993-95 at 93:2-95:9,[7] he also apparently (and inexplicably) believed that his communications with Highland's in-house lawyers were "privileged." ROA.9998.[8]

Contradicting his prior testimony from January 8, Dondero also claimed that he did not interfere with trades at the end of December 2020. *See* ROA.9978-80. Dondero was impeached with his prior inconsistent testimony, *see* ROA.10101-02, which included Dondero's admission that he learned on December 18, 2020, of Seery's order to sell CLO assets, ROA.8060-61, and that he intervened to stop those very sales:

> Q: And you personally instructed, ***on or about December 22nd, 2020***, employees of those Advisors to stop doing the trades that Mr. Seery had authorized with respect [to] SKY and AVAYA, right?

---

[7] There is no exception in the TRO permitting Dondero to communicate with Ellington about "settlement issues," and the Bankruptcy Court credited Seery's testimony that Ellington never held the role of "settlement counsel" and that such role was "fictitious." ROA.287 (citing ROA.10157 at 257:6-21, ROA.10158 at 258:2-12).

[8] This was not the first time Dondero suggested the attorney-client privilege might apply to the communications at issue. *See* ROA.7715 at 115:12-19 (Dondero's attorney attempted to assert that communications between his firm and Dugaboy's counsel remained privileged even after they were shared with Ellington). Dondero cannot reconcile his current contention that the communications were part of "shared services" with the earlier assertions that the attorney-client privilege should have protected the same communications from disclosure to Seery, the Independent Board, or the Debtor's outside counsel.

15

A: Yeah. Maybe we're splitting hairs here, but I instructed them not to trade them. I never gave instructions not to settle trades that occurred. But that's a different ball of wax.

Q: Okay. But you did instruct them not to execute trades that had not been made yet, right?

A: Yeah. Trades that I thought were inappropriate, for no business purpose, I -- I told them not to execute.

ROA.8044 at 73:2-13 (emphasis added); *see also* ROA.8062 at 76:15-19 (admitting to "personally instruct[ing] the employees of the Advisors not to execute the very trades that Mr. Seery identifie[d] in [the December 18 emails]"). This impeachment testimony from January 8, 2021, was consistent with Dondero's deposition testimony from January 5, 2021, in which he first admitted to "instruct[ing] employees of [NexPoint] and HCMFA on or around December 22nd to stop doing the trades" of Highland CLO assets. ROA.7708 at 89:6-25; *see also* ROA.7709 at 92:12-93:3 (admitting in same January 5 deposition that "it was on the basis of [the December 18 emails] that [he] instructed the [NexPoint] and HCMFA employees not to execute these sales").

## E.    <u>The Contempt Order</u>

On June 7, 2021, the Bankruptcy Court issued a 55-page Order finding Dondero in contempt for violating the TRO by (a) interfering in Highland's trading activities, and (b) communicating with Highland's employees regarding matters outside of the Shared Services Exception. ROA.251-305. The Bankruptcy Court

also assessed a monetary sanction of $450,000 and a further sanction of $100,000 for each unsuccessful appeal of the Contempt Order. ROA.304.  The Bankruptcy Court's findings are summarized below.

### 1. **Dondero Violated the Shared Services Exception under Section 2(c)**

The Bankruptcy Court found "[t]here are several examples of violations of [Section 2(c)]," and "many of the communications appeared to be adverse to the Debtor's interests." ROA.293.  In support of this finding, the Bankruptcy Court relied on substantial written communications proving that "Dondero communicated with in-house lawyer Scott Ellington about all kinds of other things," including, *inter alia*: (a) Dondero's request that Ellington procure a witness to testify against Highland at an upcoming hearing; (b) Dondero's request that Ellington "provide leadership" and coordinate the lawyers representing Dondero's interests; (c) emails establishing that Dondero and his lawyers colluded with Ellington and Leventon to prepare a "common interest" agreement; and (d) Dondero's intent to object to Highland's settlement with HarbourVest. *See* ROA.288, ROA.294.

The Bankruptcy Court also cited Dondero's admission "that he had conversations with some Debtor employees, including Ellington, after December 10, 2020, regarding things other than 'shared services,' including a 'pot plan,' and, more generally, in connection with Mr. Ellington's role as 'settlement counsel.'" ROA.293.  The Bankruptcy Court found Dondero's testimony that Ellington served

17

as "settlement counsel" lacked credibility, explaining that "[t]his court never would have approved that role for Mr. Ellington," and that Dondero's testimony on this point was further undermined by Seery's credible testimony to the contrary. ROA.287, ROA.293. The Bankruptcy Court explained that "there's nothing in the TRO that allowed Mr. Dondero to speak with any of the Debtor's employees about the pot plan," and "[i]t is clear that he knew that because on December 16, 2020, just six days after the TRO was entered, Mr. Dondero filed a motion seeking to modify the TRO to allow Mr. Dondero to speak directly with the Independent Board about a pot plan," a motion he quickly withdrew. *Id.*[9]

The Bankruptcy Court further found that Dondero violated Section 2(c) of the TRO by sending: (a) a text message instructing a Highland employee not to produce documents on Highland's system to the Committee concerning Dondero's family trust, and (b) a text message to another Highland employee about his cellphone. ROA.294.

With more than a dozen secret communications in evidence, the Bankruptcy Court found "Dondero violated Section 2(c) of the TRO numerous times. His intent does not matter." *Id.*

---

[9] The "pot plan" defense is another red herring because the written communications at issue do not concern settlement negotiations or Dondero's "pot plan."

18

**2.      Dondero Violated Section 3(a) by Interfering with Highland's Sales**

In support of its finding that Dondero violated Section 3(a) of the TRO, which prohibited Dondero from interfering with the Debtor's operations and disposition of its assets, the Bankruptcy Court considered, among other things, the December 18, 2020, email alerting Dondero to Seery's sell orders, as well as Dondero's admissions that he intervened to try and stop those sales. ROA.281-82.  As discussed *supra*, although Dondero testified at the Contempt Hearing that he did not interfere with trades after the TRO was entered, contrary to his prior testimony, the Bankruptcy Court found that "[t]he evidence does not seem to support this testimony." ROA.282 (citing to ROA.9980-81).  After carefully assessing the documentary evidence and Dondero's credibility, the Bankruptcy Court found "Dondero interfered with the Debtor's trading of Highland CLO assets after entry of the TRO," ROA.286, and was therefore in "contempt of court for interfering with or otherwise impairing the Debtor's business, including its decisions concerning disposition of assets controlled by the Debtor." ROA.296.[10]

---

[10] The Bankruptcy Court's Order reflects a fair and deliberate decision-making process.  While the Court held Dondero in contempt for wrongfully communicating with Highland's employees and interfering with its trading activities, it declined to hold Dondero in contempt for other wrongful conduct, including discarding his company-issued cell phone and trespassing on Highland's property.  ROA.297, 299-300.

19

### 3.    The Sanctions Award

The Bankruptcy Court awarded Highland $450,000 to compensate it for the "loss and expense resulting from [Dondero's] non-compliance with the TRO." ROA.304. This included the Bankruptcy Court's "conservative[] estimates" of (a) $365,921 in attorney's fees incurred in December 2020 and January 2021—a fraction of the total fees included in Highland's submitted timesheets, and (b) $33,400 in estimated legal fees preparing for and conducting the Hearing, totaling $399,321. ROA.302-03.

In explaining that "the $399,321 number is extremely conservative," the Bankruptcy Court noted that "it does not include likely significant add-ons," such as expenses incurred from depositions or transcripts, or the Committee's or local counsels' fees. ROA.248. Thus, the Bankruptcy Court found it "reasonable to round the $399,321 number up approximate $50,000, to $450,000 because of these extra items." *Id.*

## F.    The District Court Affirms Virtually All of the Contempt Order

Dondero appealed the Contempt Order to the United States District Court for the Northern District of Texas, Dallas Division (the "District Court"). ROA.193-250. On August 17, 2022, the District Court affirmed the Contempt Order in all

respects, except with regard to the unsuccessful appeal sanction.[11] ROA.11636-48. The District Court held that the TRO complied with Rule 65(d) and that the Bankruptcy Court's factual findings concerning Dondero's violations were not clearly erroneous. *Id.* The District Court also affirmed the $450,000 sanction as a proper exercise of the Bankruptcy Court's discretion. *See* ROA.11644-45.

## G.    Dondero Files the Instant Appeal

In his appeal to this Court, Dondero challenges four aspects of the Contempt Order.  First, Dondero argues that Section 2(c) of the TRO fails to comply with Rule 65(d)'s specificity requirements because it is "vague" and "ambiguous" and improperly incorporates reference to outside documents. Br. at 22-29. Second, Dondero contends that however the Shared Services Exception of Section 2(c) is interpreted, the Bankruptcy Court erred in finding that Dondero violated it. *Id.* at 29-32.  Third, Dondero argues that the Bankruptcy Court erred in concluding Dondero violated Section 2(d) of the TRO by interfering with Highland's sale of CLOs.  *Id.* at 33-38.  Finally, Dondero challenges the $450,000 sanctions award, arguing it is "excessive and impermissible." *Id.* at 38-43.

---

[11] Highland agreed that the Bankruptcy Court's sanction for unsuccessful appeals should be vacated on appeal. *See* ROA.11578 at n. 7.

# ARGUMENT

## A.    Standard Of Review

"Like the district court, this court reviews a bankruptcy court's findings of fact for clear error, and its legal conclusions de novo." *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254, 261 (5th Cir. 2009).  The "clearly erroneous" standard warrants reversal only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Butler Aviation Int'l v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1128 (5th Cir. 1993). "The clearly erroneous rule deserves strict application in this case where the district court has affirmed the bankruptcy court's findings." *In re Fabricators, Inc.*, 926 F.2d 1458, 1464 (5th Cir. 1991); *see also Placid Ref. Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.)*, 108 F.3d 609, 613 (5th Cir. 1997).

A bankruptcy court's assessment of monetary sanctions for contempt is reviewed for abuse of discretion.  *See Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) (reviewing contempt finding and damage award for abuse of discretion in non-bankruptcy appeal).  For this "deferential" review, abuse of discretion is only found if the trial court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 803 (5th Cir. 2003) (internal quotation marks omitted).  "Generally, an abuse of discretion only occurs where *no reasonable*

22

*person* could take the view adopted by the trial court." *Id.* (internal quotation marks omitted).

## B.    Section 2(c) of the TRO Complies with Rule 65

Rule 65(d) requires that "[e]very order granting an injunction … (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1).  Dondero argues Section 2(c) fails to comply with Rule 65(d) on the grounds that it is (a) "too vague and ambiguous" to give him "notice of what conduct will risk contempt," and (b) improperly refers to outside documents. *See* Br. at 22-29.  Each of these contentions is without merit.

### 1.    Section 2(c) Is Sufficiently Specific under Rule 65(d)(1)(B)

Dondero argues that Section 2(c) was impermissibly vague because "Dondero needed to interpret [it] in order to avoid violating it," Br. at 24, and because his interpretation, "however reasonable, did not serve to give the TRO a definite meaning." *Id.* at 25.  This argument is without merit.

Although the requirements of Rule 65(d) are mandatory, elaborate detail is unnecessary; an injunction need only "be framed so that those enjoined will know what conduct the court has prohibited." *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981); *see also Schermerhorn v. Centurytel, Inc. (In re Skyport Glob. Commc'ns, Inc.)*, No. 08-36737-H4-11, 2013 WL 4046397, at *44

(Bankr. S.D. Tex. Aug. 7, 2013) ("The language of an injunction should be as specific as is necessary to inform those who are enjoined exactly what conduct is prohibited"), *aff'd*, 528 B.R. 297 (S.D. Tex. 2015), *aff'd in part*, 642 F. App'x 301 (5th Cir. 2016), and *aff'd*, 661 F. App'x 835 (5th Cir. 2016). Thus, "the command for specificity is not absolute," and "[s]ome compromise must be effected in a decree between the need for articulation, and the need for sufficient comprehensiveness to prevent 'easy evasion.'" *Skyport Glob.*, 2013 WL 4046397 at *44 (internal quotation marks omitted); *see also Am. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, No. 4:19-CV-414-A, 2019 WL 3774501, at *9 (N.D. Tex. Aug. 12, 2019) ("Injunctions cannot be so narrow as to allow for easy evasion"). A court may even use general terms to define an injunction. *Skyport Glob.*, 2013 WL 4046397 at *44. In evaluating the specificity of an order, "the Court should therefore consider the order as a whole, including what was said on the record as well as its context within the overall litigation." *Id.* (internal quotation marks omitted).

Here, Section 2(c) was sufficiently specific to place Dondero on fair notice of the prohibited conduct, namely, communicating with Highland's employees about matters outside "shared services." As the District Court explained, there can be no question that Section 2(c) of the TRO meets the fair notice standard under Rule 65(d) "considering that the enjoined individual was the long-time chief executive of the

24

Highland empire and had sufficient insight into how services were shared between Highland and the related entities to enable him to comply." ROA.11643.

As discussed above, Dondero readily admitted throughout this case that he understood the meaning of "shared services," a term used in his industry. *See supra* at 7-8. Thus, Dondero's current assertion that the term "shared services" was somehow too "ambiguous" for him to understand is belied by his own admissions.

The assertion is also absurd. Even though the TRO was entered to prevent "irreparable harm" to Highland, ROA.9297, Dondero now contends that he believed "shared services" somehow permitted him to secretly communicate with Highland's employees—who themselves owed fiduciary duties to the Debtor—about matters indisputably adverse to Highland's interests. That does not pass the straight-face test. No phrase or contract or course of dealing could ever be reasonably interpreted as permitting an adverse party to conspire with employees of a debtor against their employer. *See Bradley*, 588 F.3d at 267 (argument that bankruptcy court's rulings were too vague and indefinite to support contempt finding "do not gainsay the simple fact that when [appellant] committed the acts resulting in contempt, he knew what he was prohibited from doing … and did it anyway," noting that appellant "fails to cite specific language suggesting he received contradictory instructions or that the court meant to allow the conduct it later found to be contemptuous. We reject the argument that the bankruptcy court failed to provide [him] with clear instructions

25

covering the conduct that led to the contempt finding"); *McVay v. Halliburton Energy Servs., Inc.*, 608 F. App'x 222, 227 (5th Cir. 2015) (rejecting appellant's argument that provision enjoining him from certain conduct was too "indefinite" in light of the record, noting that "[r]ead as a whole and in context," the injunction "provided [appellant] fair notice of what he may, and must not, do, and [was] clearly capable of being implemented and enforced"). Dondero's attempt to escape liability by injecting ambiguity into the clear terms of Section 2(c), *see* Br. at 26, is thus not credible.

Even if, as Dondero contends, Section 2(c) was somehow subject to "interpretation," the "mere fact that . . . interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected of him." *Martin's Herend Imps., Inc. v. Diamond & Gem Trading U.S.A. Co.*, 195 F.3d 765, 771 (5th Cir. 1999); *see also United States v. Brown*, 561 F.3d 420, 438 (5th Cir. 2009) (same). In light of the record as a whole, Dondero had fair notice of the prohibited conduct under Section 2(c). *See Skyport*, 2013 WL 4046397 at *46 (explaining that a "Preliminary Injunction Order is not *per se* invalid simply because two different interpretations are possible…. Rather, the Court's overriding consideration is simply whether the enjoined parties understand what conduct, or 'contact,' is prohibited" and finding that the order "contained sufficient detail to put the [enjoined party] on notice of the enjoined conduct" under Rule 65(d)).

26

Finally, assuming, *arguendo*, that Dondero was somehow confused about what communications with Highland employees were prohibited under Section 2(c) of the TRO, he could have—and should have—asked the Bankruptcy Court to clarify or modify its order.  As this Court has explained, the proper way to resolve "doubts about the meaning of any part of [an] injunction" is to seek the issuing court's guidance. *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 517 (5th Cir. 1969) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949)); *see also SkyPort*, 528 B.R. at 352 (rejecting as meritless an argument on appeal that an injunction did not comply with Rule 65(d) "because the way to challenge an injunction is by direct appeal or by a motion to modify," and the parties did neither); *In re Timmons*, 607 F.2d 120, 124-25 (5th Cir. 1979) (recognizing that remedy for an incorrect order is an appeal, and absent a stay even incorrect orders must be complied with until decreed invalid).  Dondero's failure to seek clarity from the Bankruptcy Court (assuming he actually needed it) does not excuse his violation of the TRO.

Accordingly, Section 2(c) of the TRO complies with Rule 65(d)(1)(B).

## 2.    Section 2(c) Describes in Reasonable Detail the Prohibited Conduct Without Reference to Outside Documents in Compliance with Rule 65(d)(1)(C)

Dondero also contends that "an ordinary person reading the TRO could not know, without reference to some source outside the TRO, specifically what 'services' the exception referred to," and that the words "shared services" "make no

sense on their own." Br. at 22-23.  For many of the same reasons discussed above, this argument is also without merit.

Rule 65(d)(1)(C) requires that "parties be able to interpret [an] injunction from the four corners of the order." *Islander E. Rental Program v. Barfield*, 145 F.3d 359 (5th Cir. 1998).  In other words, the injunction *itself* must contain sufficient "detail as to put the *party enjoined* on notice of precisely what [they are] called upon to do or refrain from doing." *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 129 (5th Cir. 1973) (emphasis added).   Section 2(c) easily meets this requirement.

Section 2(c) of the TRO unambiguously prohibited Dondero from communicating "with any of [Highland's] employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero." ROA.6874-75.  Contrary to Dondero's assertions, it did not refer to or invoke "Shared Services Agreements" or include the word "agreement" at all. Nothing in Section 2(c) directed Dondero to refer to the Shared Services Agreements to determine the scope of the prohibited conduct.  As the District Court correctly held, Section 2(c) did not expressly incorporate any outside documents in order for

28

Dondero to understand its scope. It simply referred to "shared services" (using lower case letters) that were in effect when the TRO took effect.[12]

That the "shared services" provided to the Advisors were governed by the Shared Services Agreements does not render Section 2(c) "vague" under Rule 65(d). As the District Court explained, Dondero's reasoning in this regard would create an "unworkable standard" because it would mean that any other term in the TRO that could be defined by some outside source, such as "Highland's employees," would also violate Rule 65(d). ROA.11642-43. This is not the law. *See Hill v. Washburne*, 953 F.3d 296, 310 (5th Cir. 2020) (injunction that prohibited party from "violating the Final Judgment or breaching the Settlement Agreement" by committing certain acts complied with Rule 65(d)'s four-corner requirement where, even though the injunction "does refer" to outside agreement, it did not "engraft" those agreements "in gross" or "rely on" either document "to describe its requirements" or "for clarification of what was otherwise unclear in the decree itself"). The cases relied on by Dondero are distinguishable.

In *Scott v. Schedler*, 826 F.3d 207 (5th Cir. 2016), for instance, the court held that an injunction did not comply with the specificity requirements under Rule 65(d)

---

[12] In context, this made perfect sense, because while certain Dondero affiliates (*e.g.*, the Advisors) had written Shared Services Agreements, others (including Dugaboy and Dondero himself) did not even, though they purportedly received "shared services."

where it required the Louisiana Secretary of State to "maintain in force" its "policies, procedures, and directives" related to coordination and enforcement of the National Voter Registration Act. *Id.* at 209. This provision was indisputably vague because it "refer[red] generally to the defendant's policies without defining what those policies [were]." *Id.* at 212. Here, unlike the injunction in *Schedler*, Section 2(c) did not direct Dondero to comply with some undefined or generalized "policy" or "procedure." Rather, it explicitly enjoined Dondero from communicating with Highland's employees about matters other than "shared services"—a phrase with which Dondero was admittedly familiar.

*Seattle-First National Bank v. Manges*, 900 F.2d 795, 798 (5th Cir. 1990), is also inapposite. There, an order did not comply with Rule 65(d) because it simply "adopted the magistrate's findings and recommendation" and referred to a separate TRO that would remain in effect, so an enjoined party would need to look to a second document to know what conduct was prohibited. By contrast, the conduct prohibited under Section 2(c) was clearly and explicitly articulated within the "four corners" of the TRO and does not depend on, or even reference, a separate document.

The other cases Dondero relies upon are also distinguishable. *See IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 539 (7th Cir. 1998) (injunction impermissibly vague where it enjoined insurance company from engaging in unspecified "unlawful insurance practices"); *Louis W. Epstein Family P'ship v.*

*Kmart Corp.*, 13 F.3d 762 (3d Cir. 1994) (injunction did not give fair notice where it enjoined Kmart against "otherwise" violating any term of an easement because "[a] blanket prohibition against future interference with an agreement that has been interpreted in only one respect does not give Kmart notice of all other conduct that is potentially unlawful"); *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 506 (9th Cir. 1992), *as amended* (Feb. 12, 1993) (injunction requiring the police department to follow "the Department's own stated policies and guidelines regarding the use of force and procedures for conducting searches" was impermissibly vague because it directed compliance with unidentified "policies" and "guidelines").[13]

Dondero's contention that Section 2(c) did not comply with Rule 65(d) because "the only way to make sense of [it] would be to reference some standard outside the order that would not be available to the ordinary reader," Br. at 24, thus misinterprets the law.  His reliance on *Schedler* in support of the proposition that Rule 65(d) somehow requires that any "objective," "ordinary person"—not just the

---

[13] The court in *Thomas* distinguished this type of impermissibly vague provision, which involved a "wholesale incorporation of Department policies and guidelines as an injunctive mandate," with those which permissibly "specified the act or acts sought to be restrained" by way of an incorporated order, which, in turn, set forth portions of a specific policy or guideline to be followed. *Thomas,* 978 F.2d at 509-10 (citing *Davis v. City and Cnty. of San Francisco*, 890 F.2d 1438 (9th Cir. 1989)). Thus, the court in *Thomas* did not hold that the injunction was impermissibly vague simply because it referred to an outside document, but rather, because that outside document was itself overly broad.

enjoined party—must be able to understand the scope of the prohibited conduct is also misguided. *See* Br. at 27.

As discussed above, *Schedler* stands for the unremarkable proposition that the enjoined party reading the court's order must be able to "ascertain from the document itself exactly what conduct is prohibited," since Rule 65(d) "was designed to prevent uncertainty and confusion *on the part of those faced with injunctive orders*, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schedler*, 826 F.3d at 211 (emphasis added).  Contrary to Dondero's contention, Rule 65(d) does not require that any "objective" third party, other than the person enjoined, must be able to understand the scope of conduct proscribed by an order that does not affect them.

Again, the purpose of Rule 65(d)'s "four corner" requirement is to assure the enjoined party had adequate notice of the prohibited conduct.  *See Am. Airlines*, 228 F.3d at 578.   Under the circumstances of this case, Dondero had sufficient guidance from the four corners of the TRO what communications were prohibited under Section 2(c).  *See All. for Open Soc'y Int'l., Inc. v. U.S. Agency for Int'l. Dev.*, 911 F.3d 104, 112 (2d Cir. 2018), *rev'd on other grounds*, *Agency for Int'l. Dev. v. All. for Open Soc'y Int'l., Inc.*, 140 S. Ct. 2082 (June 29, 2020) (an injunction applying to foreign "affiliates" did  not violate Rule 65(d)(1)(c)'s four-corner requirement

because "the term 'affiliate' is sufficiently clear so that the Government will be able to ascertain from the four corners of the order precisely what acts are forbidden").

Accordingly, Section 2(c) complied with Rule 65(d).

**C.      The Bankruptcy Court's Finding That Dondero Violated Section 2(c) pf the TRO by Communicating with Highland Employees About Matters Outside the Shared Services Exception Was Not Clearly Erroneous**

Dondero argues that the Bankruptcy Court clearly erred in concluding that he violated Section 2(c) of the TRO because there was no "clear and convincing evidence" to show that Dondero's communications with Highland employees "ever went beyond the 'shared services'" that were protected under Section 2(c). Br. at 29-32. Dondero fails to show that the Bankruptcy Court's factual findings that Dondero violated Section 2(c) were "clear error."

A court properly finds a party in civil contempt where the movant shows, by clear and convincing evidence, "(1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order." *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987); *see also FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995). The court need not "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated." *Am. Airlines*, 228 F.3d at 578. "The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Id.* at 581. Based

on the overwhelming, undisputed, documentary evidence, the Bankruptcy Court did not clearly err in finding that Dondero violated Section 2(c).

There can be no credible dispute that Section 2(c) prohibited Dondero's conniving communications with Highland employees. Dondero blatantly and repeatedly communicated with Highland employees in order to, *inter alia*, (a) pursue joint defense agreements between Dondero, his entities, and certain Highland employees, (b) identify witnesses to testify against Highland, (c) impede Highland's discovery obligations, and (d) otherwise collude with Highland employees to coordinate legal strategy against Highland. Dondero admits to all of these communications, *see* Br. at 32, but contends they did not constitute a violation of Section 2(c) as he understood it. This argument is premised on Dondero's faulty argument addressed above, namely, that his communications with Highland employees fell within Section 2(c) because they were somehow "tied to" the Shared Services Exception. *See* Br. at 24.

As the Bankruptcy Court properly found, and as the District Court affirmed, Dondero violated Section 2(c) of the TRO several times, and "his intent does not matter." *See* ROA.293-94. In support of its finding, the Bankruptcy Court relied on the overwhelming documentary and testimonial evidence demonstrating that Dondero communicated about "all kinds of things post-TRO other than shared services, including Mr. Dondero's own litigation strategies" in ways that were

"adverse" to Highland. ROA.286-88 (citing to evidence). As the District Court held, these "myriad communications identified by the Bankruptcy Court substantiate its factual finding sufficiently to surpass the low bar of clear error review easily." ROA.11644.

Dondero's contention that it is "immaterial" whether his communications with Highland employees advanced "Dondero's interest" in ways "adverse to the Debtor's interest," Br. at 30, outrageously implies that, under the guise of "shared services," third-parties can covertly conspire with in-house counsel to act against their employer's interests, even when the employer is a debtor subject to a bankruptcy court's oversight and jurisdiction. Dondero's contention—with its cynical implications—should be expressly and soundly rejected by this Court.

The Bankruptcy Court's factual findings that Dondero violated Section 2(c) of the TRO were supported by ample evidence and were therefore not clearly erroneous. *See Skyport Glob.*, 661 F. App'x at 840-41 (rejecting appellants' argument they did not violate an injunction "as they understood it," where the evidence clearly showed appellants' explicitly improper conduct); *Am. Airlines*, 228 F.3d at 582-83 (affirming contempt finding as not "clearly erroneous" where the TRO "clearly" set forth proscribed conduct and the evidence "strongly supports the district court's finding that the communications" at issue did not comply with TRO); *Bradley*, 588 F.3d at 267-69 (rejecting appellant's argument that "certain aspects of

his conduct that the bankruptcy court deemed contemptuous in fact were not," where bankruptcy court's factual findings were made after "extensive" hearings and "it was well within [its] discretion" to make such findings). Accordingly, the Bankruptcy Court's finding that Dondero violated Section 2(c) of the TRO should be affirmed.

## D.   The Bankruptcy Court's Finding That Dondero Violated Section 2(d) of the TRO by Interfering with Highland's Post-TRO Securities Trades Was Not Clearly Erroneous

Dondero argues that the Bankruptcy Court erred in finding that Dondero violated Section 2(d) of the TRO by interfering with post-TRO securities. Br. at 33-28. Dondero contends that the evidence does not support this finding and that the Bankruptcy Court otherwise relied only on pre-TRO conduct. As the District Court held, Dondero fails to demonstrate that the Bankruptcy Court's finding is clear error.

First, Dondero argues that the Bankruptcy Court erred in "rejecting" his testimony at the Contempt Hearing in which he denied interfering with post-TRO trades, and that such testimony precludes the Bankruptcy Court's finding that he did. Br. at 33-34. This argument is legally and factually without merit.

This Court "defers to the bankruptcy court's determinations of witness credibility." *Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 392 (5th Cir. 2018); *see also Bradley*, 588 F.3d at 269 (affirming bankruptcy court's contempt finding based on appellant's testimony, noting that "[a]fter an extensive trial on the merits and multiple hearings, it was free to disbelieve his testimony"); *In re Martin*, 963 F.2d 809, 814 (5th Cir. 1992) (affirming bankruptcy court's findings of fact based

36

"largely upon [appellant's] own testimony," noting "[t]he determination as to credibility of a witness is within the province of the bankruptcy judge").

Here, the Bankruptcy Court appropriately made a credibility determination that Dondero's Contempt Hearing testimony denying interference was less credible than his repeated earlier testimony admitting to interference after the TRO was entered.  That earlier testimony included Dondero's prior inconsistent statements made during the January 8, 2021, hearing on the Debtor's request for a preliminary injunction.  During that hearing, in response to questioning concerning a letter that Highland sent accusing him on interfering with Seery's trades on December 22, 2020, Dondero made the following, unvarnished admissions:

> Q: And you personally instructed, **on or about December 22nd, 2020**, employees of those Advisors to stop doing the trades that Mr. Seery had authorized with respect [to] SKY and AVAYA, right?
>
> A: Yeah. Maybe we're splitting hairs here, but I instructed them not to trade them. I never gave instructions not to settle trades that occurred. But that's a different ball of wax.
>
> Q: Okay. But you did instruct them not to execute trades that had not been made yet, right?
>
> A: Yeah. Trades that I thought were inappropriate, for no business purpose, I -- I told them not to execute.

37

ROA.8044 at 73:2-13 (emphasis added).[14]

Dondero also gave inconsistent testimony during his deposition that provided further support for the Bankruptcy Court's credibility determination, including Dondero's straight-forward admissions that (a) he "instructed employees of NPA and HCMFA on or around December 22nd to stop doing the trades of Avaya and Sky," and (b) it was on the basis of "learn[ing] near the closing bell on Friday, December 18th, that Mr. Seery wanted to sell AVAYA shares out of the CLOs" that he personally "instructed the NPA and HCMFA employees not to execute th[o]se sales." ROA.7708-09.

During the Contempt Hearing, Dondero certainly tried to walk back his prior inconsistent testimony, claiming that he was confused about the dates. Br. at 34. But given Dondero's extensive and unambiguous prior admissions while looking at exhibits of post-TRO written communications and the context in which the admissions were made, the Bankruptcy Court properly exercised its discretion in crediting Dondero's prior inconsistent statements. As the District Court ruled:

> Without a doubt, Dondero denied any post-TRO interference in his live testimony at the hearing on the motion for contempt. But Highland's counsel impeached him with his earlier inconsistent testimony. At that point, ***the Bankruptcy Court as fact finder properly weighed the***

---

[14] *See also* ROA.8062 (during questioning at the injunction hearing about the December 18, 2020, email string which was forwarded to Dondero and which alerted him to Seery's trading instructions, Dondero admitted that he "personally instructed the employees of the Advisors not to execute the very trades that Seery" had directed in his email).

> ***witness's credibility to determine which of the inconsistent statements
> was true.   It concluded that the earlier admission was truthful.
> Nothing more need be said on this point.***   The Bankruptcy Court's
> factual conclusion does not constitute clear error.

ROA.11641 (record citations omitted) (emphasis added).

Second, and for these same reasons, Dondero's contention that the
Bankruptcy Court's finding is based only on events that occurred before the entry of
the TRO, Br. at 35-36, fails.  As discussed above, there was ample evidence that
Dondero interfered in Highland's sale of CLO assets on or around December 22,
2020, *twelve days after* entry of the TRO, which the Bankruptcy Court expressly
understood.  *See* ROA.281 ("At issue here, in particular, are the Debtor's attempted
sales in late December 2020—after entry of the TRO").  Although the Contempt
Order references events occurring before the TRO, the record as a whole, "on the
entire evidence," fairly supports the Bankruptcy Court's factual finding that
Dondero interfered with Highland's trading in late December. *See Robertson v.
Dennis (In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003).   Accordingly, the
Bankruptcy Court's finding that Dondero violated Section 2(d) of the TRO by
interfering with post-TRO trades was not clearly erroneous and should be affirmed.[15]

---

[15] Dondero disingenuously argues that the contempt order should be overturned
because—notwithstanding his interference—Highland ultimately effectuated the
trades.  Br. at 36-37.  But getting caught in the act is no defense, because Highland's
only burden was to prove that Dondero violated an order that was in effect and that
"required certain conduct by the respondent." *Am. Airlines*, 228 F.3d at 581.

**E.** **The Bankruptcy Court's Sanction Award Was Not an Abuse of Discretion**

The bankruptcy court "has broad discretion in the assessment of damages in a civil contempt proceeding," and its sanctions award is therefore reviewed for abuse of discretion. *Am. Airlines*, 228 F.3d at 585; *see also Terrebone*, 108 F.3d at 613. Abuse of discretion can only be shown where a court "bases its decision on an erroneous legal conclusion or on a clearly erroneous finding of fact." *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 233 (5th Cir. 2011) (internal quotation marks omitted). Showing that a factual finding was clearly erroneous in a review of an award of attorneys' fees is difficult, especially given that "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection,' and, therefore, 'substantial deference' is owed the [fee-awarding] court's 'overall sense of a suit." *Id.* Thus, the bankruptcy court's findings of fact in support of its sanction award are reviewed for clear error. *See Saizan v. Delta Concrete Prods. Co., Inc.*, 448 F.3d 795, 800 (5th Cir. 2006); *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 822 (5th Cir. 1997) ("We review the district court's determination of reasonable hours and reasonable rates for clear error"); *Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990) ("We review the district court's award of attorney fees for abuse of discretion and its finding of fact supporting the award for clear error").

Dondero challenges the Bankruptcy Court's sanction on two grounds. First, he contends that the Bankruptcy Court's sanction improperly included fees incurred both (a) before the TRO was entered, and (b) in connection with conduct that was found to be non-contemptuous. Br. at 40. Dondero also contends that there was no evidentiary support for the reasonableness of the fees. Br. at 41-43. Each of these contentions is without merit.

### 1.    The Bankruptcy Court Properly Exercised Its Discretion in Awarding Fees Relating to the Contempt Motion

Dondero asserts that the Bankruptcy Court erred in awarding fees for time spent addressing conduct that was ultimately held to be non-contemptuous, contending that the Bankruptcy Court could only award fees that would not have been incurred "but-for" his misconduct. *See* Br. at 15 (relying on *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017)). This argument fails.

Where, as here, "the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories," the time that counsel spends on any claims related to that common core of facts cannot be apportioned as between the "successful" and "unsuccessful" claims. *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). "[C]laims for relief that involve a common core of facts, or derive from related legal theories, cannot be viewed as a series of discrete claims." *Hernandez v. Hill Country Tel. Coop., Inc.*, 849 F.2d 139, 144 (5th Cir. 1988). And, where, as here, "a plaintiff has obtained excellent results, [their] attorney should recover a fully

41

compensatory fee." *Hensley*, 461 U.S. at 435; *see also Roussell*, 441 F. App'x at 234 (degree of success obtained is "one of several factors to consider, in the district court's measured exercise of discretion").

Dondero's contemptuous conduct was so interrelated with the conduct that the Bankruptcy Court ultimately found not to be contemptuous that strict segregation of time spent between "successful" contempt claims and "unsuccessful" contempt claims was impossible. *See, e.g.*, ROA.300 (Bankruptcy Court finding that while Dondero's interference with Debtor's discovery obligations through his text to Melissa Schroth did not serve as basis for contempt, "the court has already addressed this as a TRO violation, ***since it was a communication with a Highland employee regarding matters other than 'shared services'***") (emphasis in original); ROA.294, 296-297 (finding that although Dondero's disposal of his cell phone did not form a basis for contempt, his text communications with Jason Rothstein about his cell phone still violated Section 2(c) of the TRO because it was an improper communication with a Highland employee).  As the District Court explained, Dondero's "nit-picky" argument is "unworkable because no attorneys segregate their billing based on the factual allegation they are currently working in support of." ROA.11647.

In awarding Highland fees for work incurred prosecuting the Contempt Motion, the Bankruptcy Court acted well within its discretion. *See Hernandez*, 849

F.2d at 144 ("The district court determined that Hernandez's claims represented related claims and that Hernandez obtained substantial relief. We find neither error nor abuse of discretion in the court's award of a fully compensatory fee"); *U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 475-76 (5th Cir. 2009) (affirming award for all fees expended on plaintiff's behalf even though the plaintiff did not prevail on every claim, where the claims "arose from the same set of contracts, same actors, and the same illegal intent to defraud the government"); *Roussell*, 441 F. App'x at 234 ("The district court's thorough analysis [of fee award] in the present case was sufficient. Its order displayed a detailed understanding of the successful and unsuccessful portions of this case").

Dondero also claims that a stray reference to fees incurred "relating to the TRO" means that the Bankruptcy Court awarded Highland "unrecoverable fees" stemming from steps it took to address Dondero's conduct leading up the entry of the TRO. *See* ROA.11013 (quoting ROA.247-49).   But Dondero provides no evidence that the sanction was, in fact, based on pre-TRO work and fees. In fact, the Bankruptcy Court specifically stated that it would order only "what [was] necessary . . . to compensate the Debtor/estate for losses *resulting from Mr. Dondero's non-compliance with a court order*." ROA.291; ROA.304 (emphasis added).   That these records date back to November (before issuance of the TRO) is thus of no moment, because the Bankruptcy Court only awarded attorneys' fees for work performed

during December and January. The Bankruptcy Court, familiar with the work of

Highland's counsel during the bankruptcy case, scrutinized the time entries to ensure

that it included only work pertaining to the contempt proceeding. In any event, given

the Bankruptcy Court's conservative assumptions when determining the fee award,

and the reasonableness of that award given Dondero's misconduct, the court did not

abuse its discretion.

**2.     The Bankruptcy Court's Factual Findings Supporting Its Fee Award Were Not Clearly Erroneous**

Dondero also contends that the Bankruptcy Court's compensatory award was

not supported by evidence that Highland's fees were "reasonable." *See* Br. at 41-43.

Dondero's contention is misplaced.

The Bankruptcy Court admitted into evidence eighty-seven pages of detailed,

daily time records that identified the timekeeper, hourly rate, time spent, and work

performed for each task. *See* ROA.9068–156. The Bankruptcy Court concluded that

the time records adequately established the reasonableness and necessity of the fees

charged, a conclusion that does not constitute an abuse of discretion—particularly

where the Bankruptcy Court had substantial experience with the parties and their

counsel as well as the nature and scope of the proceeding.

Dondero provides no authority to support his conclusory argument that the

"size of the fee award" required "trimming." *See* Br. at 41. *Topalian v. Ehrman*, 3

F.3d 931, 937-38 (5th Cir. 1993), is easily distinguishable, because the court in that

case found that the trial court failed to sufficiently describe how it arrived at the fee award and there was "nothing in the findings from the proceedings below that would illuminate as to the court's decision-making process in arriving at these severe sanction amounts." *Id.* at 936-38. Here, by contrast, the Bankruptcy Court carefully evaluated almost 100 pages of detailed time entries and specified its reasoning in support of each of its figures. *See* ROA.302-03 (citing invoices).

Dondero cites to two other cases that actually support Highland's position. In *Wegner*, 129 F.3d at 822, the Fifth Circuit affirmed the district court's fee award even though the fee applicant's "proffer of documentation was marginal at best, and arguably inadequate," because it lacked "any time sheets or descriptions of the work done." *Id.* at 823. The Court held that "[a]lthough [applicant's] documentation was sparse, we cannot say that it was so vague or incomplete that the district court was precluded from conducting a meaningful review of whether the hours claimed on this litigation were reasonably expended." *Id.* at 822. The Court further explained, "[o]ther than identifying the glaring holes in [applicant's] documentation (*e.g.,* the nondescriptive billing), [appellant] has not provided us … with detailed information explaining why or how the total number of hours claimed were not reasonable," and "[u]nder these circumstances, given the district court's familiarity with the legal work done on this relatively straightforward contract interpretation case as well as our deferential standard of review, we are constrained to hold that the district court

had sufficient information before it to determine reasonable hours." *Id.* Here, the Bankruptcy Court relied on detailed time records and Dondero, like the appellant in *Wegner*, failed to provide any support for his argument that the fee award was not reasonable, other than through baseless attacks on the sufficiency of Highland's documentation.

Dondero also cites to *Payne v. University of Southern Mississippi*, 681 F. App'x 384 (5th Cir. 2017), another case that supports Highland's position. There, the Fifth Circuit affirmed an award of attorneys' fees, explaining that while "[n]one of the defendants provided contemporaneous billing records, [] this does not preclude an award of fees per se, as long as the evidence produced is adequate to determine reasonable hours." 681 F. App'x at 390 (internal quotation marks omitted). It also noted that "defendants instead organized their invoices into detailed and lengthy charts that showed the date tasks were performed, a brief description of tasks performed, the time spent on each task, the hourly rate, and a brief explanation for seeking the fees. These charts are sufficiently detailed to determine reasonable attorneys' fees … and we see no evidence of clear error to disturb the district court's determination." *Id.* (internal citation omitted). Here, too, Highland's meticulous invoices were more than sufficient to support the Bankruptcy Court's findings of "reasonableness" for the fee award.

Dondero cannot come close to meeting the high "clear error" threshold, and the Bankruptcy Court's sanction award should be affirmed.

## CONCLUSION

For the foregoing reasons, Appellee respectfully requests that this Court affirm the District Court's Order, which affirmed the Bankruptcy Court's findings and its $450,000 sanction award, in all respects.

DOCS_NY:47117.2 36027/003

Date: February 17, 2023                    **HAYWARD PLLC**

                                           */s/ Zachery Z Annable*
                                           Melissa S. Hayward
                                           Texas Bar No. 24044908
                                           MHayward@HaywardFirm.com
                                           Zachery Z. Annable
                                           Texas Bar No. 24053075
                                           ZAnnable@HaywardFirm.com
                                           10501 N. Central Expy, Ste. 106
                                           Dallas, Texas 75231
                                           Tel: (972) 755-7100
                                           Fax: (972) 755-7110

                                           -and-

                                           **PACHULSKI STANG ZIEHL &
                                           JONES LLP**

                                           Jeffrey N. Pomerantz (CA Bar No. 143717)
                                           John Morris (NY Bar No. 2405397)
                                           Gregory V. Demo (NY Bar No. 5371992)
                                           Hayley R. Winograd (NY Bar No. 5612569)
                                           10100 Santa Monica Blvd., 13th Floor
                                           Los Angeles, CA 90067
                                           Telephone: (310) 277-6910
                                           Facsimile: (310) 201-0760
                                           -mail:    jpomerantz@pszjlaw.com
                                                     jmorris@pszjlaw.com
                                                     gdemo@pszjlaw.com
                                                     hwinograd@pszjlaw.com


                                           *Counsel for Appellee*

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)</u>

1.    This document complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(b) because, including footnotes and excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 10,422 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, typeface Times New Roman, 14-point type (12-point or larger for footnotes).

3.    Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and this document has been scanned for viruses and is free of them.

*/s/ Zachery Z. Annable*
Attorney for Appellee
Dated: February 17, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 17, 2023, the foregoing Brief of Appellee was electronically filed using the appellate CM/ECF system.  I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.

*/s/ Zachery Z. Annable*
Attorney for Appellee
