No. 22-10889

_____

In the
**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

**In the matter of Highland Capital Management, L.P.,**

*Debtor.*

_____

**James Dondero, Defendant in the above-captioned adversary proceeding and a creditor, indirect equity holder, and party in interest in the above-captioned bankruptcy case,**

*Appellant,*

v.

**Highland Capital Management, L.P., Plaintiff in the above-captioned adversary proceeding and the Debtor in the above- captioned bankruptcy case,**

*Appellee.*

_____

**Appeal from the United States District Court**
**for the Northern District of Texas, Dallas Division**
*Honorable David Godbey, United States District Judge*
No. 3:21-cv-01590-N

_____

**APPELLANT'S REPLY BRIEF**

_____

**Jeffrey S. Levinger**
jlevinger@levingerpc.com
**J. Carl Cecere (of counsel)**
ccecere@cecerepc.com
**Levinger PC**
1700 Pacific Ave., Suite 2390
Dallas, Texas 75201
Telephone:  214-855-6817
Facsimile:  214-817-4509

*Attorneys for Appellant*
*James Dondero*

TABLE OF CONTENTS

Table of Authorities ................................................................ ii

Introduction ...........................................................................1

Arguments in Reply ................................................................2

I.   Dondero did not violate Section 2(c) of the TRO. ...........................2

     A.   Section 2(c)'s "shared services" exception lacks the requisite
          clarity and specificity to be enforceable by contempt. .....................2

          1.   The "shared services" exception is vague and irresolvably
               ambiguous. ..................................................................3

          2.   The "shared services" exception requires reference to
               documents outside the TRO to determine its scope.................12

          3.   Dondero has not forfeited his challenges to Section 2(c)'s
               terms. ......................................................................14

     B.   Dondero's communications with Highland employees fall
          squarely within any definition of Section 2(c)'s "shared services"
          exception. ...................................................................16

II.  Dondero did not violate Section 2(d) of the TRO because he did not
     interfere with any post-TRO securities trades. ..............................20

III. The amount of the sanction is excessive and impermissible.........................24

Conclusion ...........................................................................28

Certificate of Service ..............................................................29

Certificate Regarding Privacy Redactions and Virus Scanning ..............................29

Certificate of Compliance With Type-Volume Limit ...........................................30

## TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l. Dev. v. All. for Open Soc'y Int'l., Inc.*,
  140 S. Ct. 2082 (June 29, 2020) .......................................................... 14

*All. for Open Soc'y Int'l., Inc. v. U.S. Agency for Int'l. Dev.*,
  911 F.3d 104 (2d Cir. 2018) ............................................................... 14

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
  228 F.3d 574 (5th Cir. 2000) .............................................................. 16

*Black v. SettlePou, P.C.*,
  732 F.3d 492 (5th Cir. 2013) .............................................................. 27

*Epstein Family Partnership v. Kmart Corp.*,
  13 F.3d 762 (3d Cir. 1994) .................................................................... 8

*Gulf King Shrimp Co. v. Wirtz*,
  407 F.2d 508 (5th Cir. 1969) .............................................................. 16

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ............................................................... 25, 26, 27

*Hill v. Washburne*,
  953 F.3d 296 (5th Cir. 2020) .............................................................. 13

*IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*,
  136 F.3d 537 (7th Cir. 1998) ................................................................ 8

*In re Timmons*,
  607 F.2d 120 (5th Cir. 1979) .............................................................. 16

*Ingalls v. Thompson (In re Bradley)*,
  588 F.3d 254 (5th Cir. 2009) ............................................................ 6, 7

*Islander E. Rental Program v. Barfield*,
  145 F.3d 359 (5th Cir. 1998) ......................................................... 12, 13

*Martin's Herend Imps., Inc. v. Diamond & Gem Trading U.S.A. Co.*,
  195 F.3d 765 (5th Cir. 1999) .............................................................. 10

*McVay v. Halliburton Energy Servs., Inc.*,
608 F. App'x 222 (5th Cir. 2015) (per curiam) ....................................................7

*Meyer v. Brown & Root Constr. Co.*,
661 F.2d 369 (5th Cir. 1981) ...............................................................................5

*Olson v. Schweiker*,
663 F.2d 593 (5th Cir. 1981) ......................................................................... 20, 21

*Payne v. Univ. of S. Miss.*,
681 F. App'x 384 (5th Cir. 2017) (per curiam) ..................................................27

*Roussell v. Brinker Int'l*,
441 F. App'x 222 (5th Cir. 2011) (per curiam) .................................................26

*Schermerhorn v. Centurytel, Inc. (In re Skyport Glob. Commc'ns, Inc.)*,
No. 08-36737-H4-11, 2013 WL 4046397 (Bankr. S.D. Tex. Aug. 7, 2013).........5

*Schmidt v. Lessard*,
414 U.S. 473 (1974) .........................................................................................5, 6

*Scott v. Schedler*,
826 F.3d 207 (5th Cir. 2016) ...................................................................... passim

*Seattle-First National Bank v. Manges*,
900 F.2d 795 (5th Cir. 1990) ...............................................................................8

*Thomas v. County of Los Angeles*,
978 F.2d 504 (9th Cir. 1992) ...............................................................................8

*Topalian v. Ehrman*,
3 F.3d 931 (5th Cir. 1993) ..................................................................................27

*U.S. Steel Corp. v. United Mine Workers of Am.*,
519 F.2d 1236 (5th Cir.1975) ...............................................................................5

*Wegner v. Standard Ins.*,
129 F.3d 814 (5th Cir. 1997) ..............................................................................27

**Rules**

FED. R. CIV. P. 65 ............................................................................... passim

FED. R. CIV. P. 65(d) .......................................................................... passim

FED. R. CIV. P. 65(d)(1)(C) ...................................................................................12

**Other Authorities**

WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE
§ 2955 (1973) ...........................................................................................5

## INTRODUCTION

Highland's brief confirms what Dondero has said from the beginning—that Highland's contempt argument is built on a record of smoke and mirrors. (Dondero Br. ii) Its interpretation of the TRO's Section 2(c) is an illusion: It contends that provision's "shared services" exception has an industry-standard definition, confining the phrase's meaning to *mutually beneficial* services and excluding services for one party's sole benefit. But this supposed industry standard evaporates on inspection, lacking any foundation in the TRO's language, Highland's operational history, or true industry practice—ultimately proving to have no enforceable boundaries at all. And to establish that Dondero violated this illusory "industry-standard" definition, Highland must invoke the specter of a secret conspiracy lacking any evidentiary basis and consisting of nothing but overheated rhetoric.

Highland tries similar tactics in its effort to demonstrate that Dondero violated Section 2(d), hinting at evidence that Dondero interfered with Highland's post-TRO securities trades. But such evidence objectively, demonstrably, and irrefutably does not exist. So Highland must lean on "credibility" findings that lack any evidentiary support.

Highland gets even more creative in trying to disguise the numerous flaws in the Bankruptcy Court's $450,000 attorney's fee award, summoning a version of the

1

sanction that bears no resemblance to reality. Highland pretends the Bankruptcy Court did not award pre-TRO fees when the court plainly did, surmises that its unsuccessful and successful bases for contempt are inextricably intertwined when they clearly are not, and suggests that it offered sufficient proof of the reasonableness of its fees when it demonstrably did not. But none of Highland's conjuring can hide the numerous errors in the decision below. Any one of them requires reversal.

### ARGUMENTS IN REPLY

## I.    Dondero did not violate Section 2(c) of the TRO.

Highland's effort to support the Bankruptcy Court's decision to hold Dondero in contempt for violating Section 2(c) of the TRO is ultimately futile. Try as it might, Highland cannot overcome the basic legal problem that Section 2(c) lacks the clarity necessary to be enforceable in contempt, or the evidentiary problem that Dondero never violated that provision under any interpretation that has been offered to define it.

### A.    Section 2(c)'s "shared services" exception lacks the requisite clarity and specificity to be enforceable by contempt.

To ensure compatibility with Rule 65 and the requisites of Due Process, this Court has held that an injunction's terms must be intelligible to an "ordinary person reading the court's order." (Dondero Br. 22, quoting *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016)) But Highland cannot explain how Section 2(c)'s "shared

services" exception meets this standard—and its attempt to do so only makes things worse.

### 1.      The "shared services" exception is vague and irresolvably ambiguous.

The most basic and fundamental problem that dooms Section 2(c) as a basis for contempt is that an ordinary person would not be able to make heads or tails of the phrase "shared services." Such a person would have no way of knowing what "services" were being referenced, who was "shar[ing]" them, how they were being "shared," or what "communicat[ions]" with Highland relating to these "shared services" would be necessary or appropriate. (ROA.6874-75)

In this appeal, Highland abandons its own previous attempts to make sense of the phrase, as well as those offered by the Bankruptcy Court and the District Court. But its newly minted position on the meaning of the phrase fares no better.  Highland now insists for the first time that "shared services" is a term of art familiar to those in the "investment management" industry, referring to certain "back-and middle-office services" shared between related companies "'so that each subsidiary doesn't have to have their own expensive, duplicative set of employees.'"  (Highland Br. 7-8, quoting ROA.10056-58; *id.* 25) Even assuming that is all true, an "ordinary person" would have no familiarity with this industry-specific term of art. And even the industry insider would not find it useful in giving Section 2(c) a clear and unambiguous meaning because Highland does not, and cannot, demonstrate that

there is any uniform industry-wide set of shared services, any industry-standard method of sharing them, or any industry-wide understanding of the communications that are necessary or appropriate to fulfill them. Companies instead share services in a myriad of different ways. So Highland's industry-specific gloss on the phrase "shared services" is ultimately no less vague than the phrase's plain meaning—even to the *non*-ordinary person who might be familiar with it.

Knowing this, Highland tries to change this Court's interpretation of Rule 65 and the rules for construing injunctions, insisting that *Schedler*'s objective, "ordinary person" standard does not really exist. (*See* Highland Br. 31-32) Instead, Highland insists that the TRO must be interpreted according to a *subjective* standard that is satisfied so long as *Dondero* had reason to know what Section 2(c) prohibits, and what the "shared services" exception allowed, by virtue of his unique experience as "the long-time chief executive of the Highland empire." (Highland Br. 24-25) And thus Highland suggests that Dondero can be held in contempt of a secret standard, knowable only to the Bankruptcy Court and himself, even if no one else could understand what it means or entails.

But that is not the law. Certainly, *Schedler* and other cases have suggested that Rule 65(d)'s general purpose is to "prevent uncertainty and confusion on the part of those faced with injunctive orders" (Highland Br. 32, quoting 826 F.3d at 211), and therefore requires "those enjoined [to] know what conduct the court has prohibited"

(Highland Br. 23-24, citing *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981); *Schermerhorn v. Centurytel, Inc. (In re Skyport Glob. Commc'ns, Inc.)*, No. 08-36737-H4-11, 2013 WL 4046397 (Bankr. S.D. Tex. Aug. 7, 2013)). But that does not mean an injunction is enforceable if the person enjoined and the enjoining judge are the *only* persons capable of understanding it. Rather, *Schedler* makes clear that Rule 65 enforces this general purpose of protecting individual defendants through its objective, "ordinary person" standard, which requires that an injunction be comprehensible to *anyone*. And *Schedler* is hardly alone. Indeed, in articulating the objective "ordinary person" standard, *Schedler* relied on this Court's own precedent, Supreme Court precedent, and the leading treatise on federal practice, all of which adopt the same objective requirement. *See Schedler*, 826 F.3d at 211-12 (citing *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 n.20 (5th Cir. 1975) ("The drafting standard established by Rule 65(d) is that the ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed."); WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2955 at 536-37 (1973) (same); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.")).

The reasons for this objective rule are obvious and long-settled: No court reviewing the propriety of a contempt sanction can be sure a sanctioned person understood an injunction's prohibitions if the court cannot understand those prohibitions for itself. Accordingly, the objective standard exists to ensure that an "appellate tribunal" reviewing an injunction or a contempt sanction may "know precisely what it is reviewing." *Schmidt*, 414 U.S. at 477. The law could hardly be otherwise.

And none of the authorities Highland offers suggests that the law is otherwise. Highland's reliance on *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254 (5th Cir. 2009) is completely off base, because the contemnor's challenge in that case did not concern confusion about the content of the court's "rulings" (Highland Br. 25), but involved only alleged confusion arising from the "proceedings" in which those rulings were made. 588 F.3d at 261. The bankruptcy court in that case initially issued its injunction orally on the record before following up with a written version "materially identical to the oral command." *Id*. at 262. But the contemnor violated the injunction before the court entered the written order. *Id*. 260-61. The contemnor never challenged the clarity of the injunction itself—which was "clear and specific"—but instead challenged only whether the injunction could be enforced before it had been reduced to writing. *Id*. at 260. So *In re Bradley* is a situation in which the contemnor "knew what he was prohibited from doing" and received no

"contradictory instructions" because the ruling was objectively clear from the court's oral ruling, not merely because the contemnor subjectively understood it. (Highland Br. 25, quoting 588 F.3d at 267)

Highland's reliance on *McVay v. Halliburton Energy Servs., Inc.*, 608 F. App'x 222 (5th Cir. 2015) (per curiam), is similarly misplaced—and not only because it is a non-precedential per curiam opinion. For one thing, *McVay* did not involve a challenge to a court-issued injunction; it involved a challenge to an "injunction in [an] arbitration award." *Id*. at 225-26. And the Court concluded that "the Rule 65(d) requirements are not strictly applied to arbitration awards." *Id*. at 226. For another, the Court determined that the injunction's terms gave "fair notice" to the contemnor because they were clear and unambiguous *to all*, not just to the contemnor. (Highland Br. 26, quoting 608 F. App'x at 227) That the Court reached this conclusion after considering the record "as a whole" and the "context" of the ruling did not mean the terms were unclear *before* the Court undertook that contextual reading. (*Id*.) Nor did the Court rely on sources extrinsic to the injunction in a manner that Rule 65 would have prohibited, when that "context" came from other portions of "arbitrator's award." 608 F. App'x at 227.

Highland fares no better in trying to distinguish Dondero's authorities. Highland claims that Section 2(c) of the TRO is somehow less problematic than the injunction language challenged in *Schedler*, *Seattle-First National Bank v. Manges*,

7

900 F.2d 795 (5th Cir. 1990), *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537 (7th Cir. 1998), *Epstein Family Partnership v. Kmart Corp.*, 13 F.3d 762 (3d Cir. 1994), and *Thomas v. County of Los Angeles*, 978 F.2d 504 (9th Cir. 1992), *as amended* (Feb. 12, 1993), because Section 2(c) involved no "undefined or generalized 'policy' or 'procedure,'" "guidelines," "magistrate's findings and recommendation," "unlawful insurance practices," or a "blanket prohibition against future interference with an agreement." (*See* Highland Br. 29-31) But Section 2(c)'s language is actually worse than the challenged language in those cases, which at least referred to actual, identifiable documents—even though the content of those documents could not be determined from the injunctions themselves. By contrast, Highland insists that "shared services" does not refer to *anything* so concrete— because Highland maintains it does not refer to Highland's obligations under the Shared Services Agreements. It takes some level of interpretation to even determine what the phrase is referencing. That makes it inescapably vague.

What is more, Highland's focus on the facts of these cases elides their underlying reasoning, which is fatal to its position. If Highland were right, and the test for determining the adequacy of an injunction is entirely subjective, then each of these cases would have come out the other way, because the contemnors at issue would have known and been able to identify the policies, procedures, guidelines, insurance practices, agreements, and findings at issue even if those documents were

not defined in the injunctions themselves. But the courts in each of these cases found the language to be impermissibly vague because the courts employed an objective standard and concluded that an ordinary person would have no idea what the language prohibited or permitted. And that is fatal to Highland's position.

Yet the TRO here would remain unenforceable by contempt even under the subjective test Highland advocates. Even assuming the TRO must be interpreted to mean what Dondero understood it to mean, there is no evidence that Dondero actually understood the phrase to refer to the supposed "industry-wide" standard Highland now advocates. After all, that meaning differs from the meaning given to the phrase by the District Court, which concluded that it memorialized Highland's actual practices—the "operational reality" of "the way Highland and the relevant entities had conducted themselves previously." (Dondero Br. 14, quoting ROA.11642) And the District Court's definition was an effort to avoid still another meaning of the phrase—and the meaning adopted by both Dondero and the Bankruptcy Court—that the "shared services" referenced in Section 2(c) means the services covered under the Shared Services Agreements. (Dondero Br. 29) Highland cannot explain how its new industry-standard definition of "shared services" is superior to these other definitions or why Dondero would have adopted it. Nor can it explain away the lack of clarity that results if the phrase is given the meaning that Dondero and the Bankruptcy Court both adopted because, as Highland's CEO

9

admitted, the Shared Services Agreements referenced in that definition are "certainly ambiguous in places," leading to several levels of impermissible ambiguity. (Dondero Br. 25, quoting ROA.10157)

That ambiguity is more than merely a matter of whether the TRO is subject to some "interpretation." (Highland Br. 26) A court may certainly interpret an injunction along the way to enforcing it, so long as the interpretive process results in a definitive conclusion. That is what the court was able to do in *In re SkyPort Global Communications, Inc.*, by resolving "any ambiguities or uncertainties . . . in a light favorable to the entities charged with contempt." No. 08-36737-H4-11, 2013 WL 4046397, at *47 (Bankr. S.D. Tex. Aug. 7, 2013), *aff'd*, 528 B.R. 297 (S.D. Tex. 2015), *aff'd in part sub nom. In re Skyport Glob. Commc'n, Inc.*, 642 F. App'x 301 (5th Cir. 2016), *and aff'd sub nom. Matter of Skyport Glob. Commc'ns, Inc.*, 661 F. App'x 835 (5th Cir. 2016). But Highland cannot explain how the numerous vagaries and ambiguities in the "shared services" exception can be resolved definitively in its favor, and following the roadmap of *In re Skyport* would result for a win for Dondero. These ambiguities go to the core of the conduct prohibited under the TRO, rendering its language "so vague and ambiguous that a party cannot know what is expected of him." (Highland Br. 26, *quoting Martin's Herend Imps., Inc. v. Diamond & Gem Trading U.S.A. Co.*, 195 F.3d 765, 771 (5th Cir. 1999)) And that is an independent reason why the TRO cannot be enforced through contempt.

The inexplicable and idiosyncratic limitations that Highland places on its own supposed industry standard are yet another problem. Highland insists that the "shared services" referenced in Section 2(c) must be limited to services that mutually benefit *both* Highland and the Advisors, and anything that serves only the Advisors' interests or concerns matters "adverse to the Debtor's interest" would fall outside the "shared services" safe harbor. (Highland Br. 17, quoting ROA.293) But that supposed limitation finds no footing in the language of the TRO, the language of the Shared Services Agreements, the "operational reality" of Highland's business, or industry practice as Highland defines it. To the contrary, the Advisors' entire reason for entering into the Shared Services Agreements was to secure a right to use Highland's front- and middle-offices services *for themselves*, even when Highland would otherwise have prohibited such use. Highland appears to have invented this limitation out of whole cloth, construing the vagaries of the TRO's language in its own favor simply so it might place Dondero's communications with Highland employees outside the boundaries of the "shared services" safe harbor. This is precisely the abuse that Rule 65 and Due Process protect against. The Court therefore should not accept Highland's effort to manipulate the vague and ambiguous boundaries of the "shared services" exception, which ultimately only confirms that such vagaries and ambiguities exist.

### 2. The "shared services" exception requires reference to documents outside the TRO to determine its scope.

One final problem remains: Nothing about Highland's newly minted, conveniently defined, and thoroughly insupportable definition of the phrase "shared services" can overcome its most natural meaning, which requires the "shared services" exception to refer to the services provided under the Shared Services Agreements. That is the only definition of the phrase that makes sense. After all, the Shared Services Agreements define the "services" that are "shared" between Highland and the Advisors.

But that logical reading of Section 2(c) causes it to run headlong into another problem presented by Rule 65(d), by requiring that the TRO's prohibitions be defined by reference "to the complaint or other document" outside the TRO. Highland tries to avoid this problem by noting that the TRO did not "refer to or invoke" the Shared Services Agreements expressly. (Highland Br. 28) But Rule 65(d) is not so narrowly circumscribed as to invalidate injunctions only when they reference some outside document expressly. Rather, the rule prohibits any injunction that requires "referring to the complaint or other document" to "describe" the "act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). Indeed, Highland elsewhere admits that "Rule 65(d)(1)(C) requires that 'parties be able to interpret [an] injunction from the four corners of the order.'" (Highland Br. 28, quoting *Islander E. Rental Program v. Barfield*, 145 F.3d 359 (5th Cir. 1998)) That is an

outright prohibition against making use of outside documents to interpret the terms of an injunction.

Highland cannot cite any authority that relaxes that prohibition. Although *Hill v. Washburne*, 953 F.3d 296 (5th Cir. 2020) upheld an injunction prohibiting a party from "violating the Final Judgment or breaching the Settlement Agreement" (Highland Br. 29, quoting 953 F.3d at 310), that case creates no allowance for parties to refer to documents outside an injunction to interpret it. Quite the opposite. The Court upheld the injunction in *Hill* solely because the injunction at issue simply "referr[ed]" to the judgment and settlement agreement at issue, and did not "rely on either document to describe its requirements." 953 F.3d at 310. The injunction elsewhere specifically prohibited the contemnor from "violating those documents by taking certain, specific actions." *Id*. And the Court cautioned that the injunction would have violated Rule 65 if either document had to be referenced "for clarification of what was otherwise unclear in the decree itself." *Id.* (quoting *Schedler*, 826 F.3d at 213). Accordingly, *Hill* supports Dondero's position, not Highland's.

Furthermore, the District Court's concern that enforcing Rule 65(d) according to its plain terms creates an "unworkable standard" is entirely unfounded. (Highland Br. 29, citing ROA.11642-43) And Highland's own authorities explain why. (*See id*. 32, citing *All. for Open Soc'y Int'l., Inc. v. U.S. Agency for Int'l. Dev.*, 911 F.3d 104,

112 (2d Cir. 2018), *rev'd on other grounds*, *Agency for Int'l. Dev. v. All. for Open Soc'y Int'l., Inc.*, 140 S. Ct. 2082 (June 29, 2020)) The District Court worried that confining interpretation of the TRO to its four corners alone would render provisions outside Section 2(c) problematic under Rule 65(d)—such as Section 2(d)'s reference to "Highland's employees." (Highland Br. 29, quoting ROA.11642-43) But as the Second Circuit explained in *Alliance for Open Society*, certain terms will be "sufficiently clear" on their own so that their meaning can be ascertained from "the four corners" of the injunction even if they remain undefined. 911 F.3d at 112. The court thus held that the term "affiliate" possessed this inherent clarity. *Id*. The term "employees" does too.

Finally, this is not a case in which reference to the Shared Services Agreements is optional, and the term "*could* be defined by some outside source." (Highland Br. 29, emphasis added) Rather, the term *must* be defined by an outside source—it is impossible to give the term "shared services" *any* definite meaning without referring to the Shared Services Agreements. And even then, the term remains problematic because of the vagueness and ambiguities in those Agreements themselves. That is yet another reason why Section 2(c)'s "shared services" exception violates Rule 65 and the requisites of Due Process.

### 3. Dondero has not forfeited his challenges to Section 2(c)'s terms.

Despite what Highland insists, Dondero did not forfeit his challenges to the

many problems with the TRO's terms simply because he did not challenge the TRO when it was first entered. (Highland Br. 27) Dondero was not initially "confused" about its terms. (*Id.*) He thought he understood them—or at least understood them well enough to comply with them. And Highland nowhere denies that Dondero modified his behavior to comply with that understanding, restricting his communications with Highland employees to matters covered under the Shared Services Agreements. (*See* Dondero Br. 7, 9-10, 21) Highland also admits that when Dondero became concerned that he might have to engage in communications with Highland's Board in order to properly advocate for his "pot plan"—which Section 2(a) plainly prohibited—he filed a motion to modify the TRO, although he later withdrew it when he found another way. (Highland Br. 18) Highland offers this episode to somehow suggest there was something nefarious about Dondero's behavior. But it actually demonstrates that Dondero respected the TRO and sought to comply with it. His compliance became an issue only when Highland tried to rewrite the terms of the TRO to hold him in contempt for non-contemptuous conduct.

Injunctions frequently contain latent ambiguities that the parties benefitting from them later try to exploit through contempt motions. Accordingly, while parties can generally be expected to resolve "'doubts about the meaning'" of an injunction by "seek[ing] the issuing court's guidance," and must correct "incorrect order[s]" that make them clearly different from what was intended (Highland Br. 27, quoting

*Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 517 (5th Cir. 1969), and *In re Timmons*, 607 F.2d 120, 124-25 (5th Cir. 1979)), the burden of ensuring an injunction's clarity does not fall solely on the shoulders of Dondero as the person enjoined. Rather, under this Court's precedent, that obligation fell on Highland. If it wanted to hold Dondero in contempt, it bore the burden to establish that the order "delineate[s] 'definite and specific' mandates" that Dondero violated. *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000). Highland's inability to meet that burden is fatal to the contempt sanction.

### B.     Dondero's communications with Highland employees fall squarely within any definition of Section 2(c)'s "shared services" exception.

Highland's effort to manipulate the language of Section 2(c) is ultimately immaterial, however, because Dondero's communications with Highland employees fall squarely within the provision's "shared services" exception regardless of how that vague and ambiguous phrase is defined. Highland essentially concedes that if the exception is given the meaning adopted by the Bankruptcy Court—referring to the services promised to the Advisors under the Shared Services Agreements—then Dondero's contacts all fall within it. Highland never denies that Dondero confined his communications with Highland employees to the "legal issues," "finance and accounting" services, and "telecom" support that Highland admits to be covered by the Shared Services Agreements. (Dondero Br. 8-9; Highland Br. 7-8) And Highland offers no reason why those contacts should otherwise be excluded from the "shared

services" safe harbor under that definition. Highland likewise implicitly concedes that the communications fall within "shared services" if the phrase is given the meaning adopted by the District Court, because Highland makes no attempt to demonstrate that Dondero's communications with Highland employees departed from the "operational reality" of the Advisors' interactions with Highland employees to obtain shared services before the TRO's entry. (Dondero Br. 14, quoting ROA.11642)

Applying Highland's cramped, unsupported, and newly invented definition of the phrase leads to the same result. Highland cannot locate any evidence to support the Bankruptcy Court's conclusion that any of the communications Highland invokes were "directly adverse to Highland's interests." (Highland Br. 17, quoting ROA.293)

To start with, Highland does not even try to defend the Bankruptcy Court's conclusions regarding several of the communications it deemed to violate Section 2(c). Highland makes no attempt to explain how Dondero's communications with its IT Department about his phone or with its accountants about the Dugaboy Trust's records were "adverse" to Highland's interests. Indeed, it offers no reason to believe these communications fell outside the "shared services" exception at all, beyond insisting that neither Dondero nor the Dugaboy Trust had their own shared services agreements with Highland. (Highland Br. 7 n.4, 29 n.12) But that argument is self-

refuting, given Highland's repeated insistence that the definition of "shared services" has nothing to do with *any* shared services agreement. And those contacts were irrefutably covered under the *Advisors'* Shared Services Agreements. (Dondero Br. 11)

Rather, Highland focuses nearly all its attention on five isolated communications with its lawyers Scott Ellington and Isaac Leventon. (Highland Br. 12-13) Yet these too are not evidence of communications by Dondero that were "adverse" to Highland's interests. Two of them were not initiated by Dondero at all, coming instead from his lawyer (and former bankruptcy judge) Michael Lynn and Advisor trustee Grant Scott. (ROA.7666, 7683) And these communications provide no evidence—let alone clear and convincing evidence—of any nefarious plot to pit Highland's own lawyers against Highland.

In one email (ROA.7666), Lynn simply asked Ellington to identify a witness who could testify at some "unknown hearing" (ROA.233 n.119)—with no context on why the witness would be needed, what the witness was likely to say, or whether the subject of his testimony would be adverse to Highland's interests.

And despite what Highland insists, the next email (ROA.7668-69) did not concern any "collaborat[ion]" between Dondero, Ellington, and Leventon on any "common interest" agreement (Highland Br. 12-13, 17). On the contrary, the record is clear that neither Ellington nor Leventon were involved in drafting any "joint

interest or mutual defense agreement." (ROA.7715-16) Rather, the email in question involved only an attempt to coordinate attendees for an unspecified "joint meeting." (ROA.7668) And while Highland makes much of Dondero's request in this email that Ellington provide "leadership" (Highland Br. 3, 13, 17, quoting ROA.7668), the only apparent "leadership" Dondero requested related to scheduling the meeting and determining its attendees. Highland provides no reason to conclude otherwise.

The remainder of the communications are similarly innocuous. Highland admits they involved nothing more than an attempt "to schedule a call" on some unknown subject (Highland Br. 13, citing ROA.7683), asking Leventon for "contact information" on another unknown matter (*id.*, citing ROA.7683), and informing Ellington about Dondero's plans to object to the HarbourVest settlement (*id.*, citing ROA.7182). This does not come close to contemptuous conduct.

And while Highland insists these communications were "secret" and "conniving"—part of an effort to "covertly conspire with in-house counsel to act against their employer's interests" (Highland Br. 2, 18, 34, 35)—Highland offers no evidence whatsoever to back up that overheated rhetoric. Dondero's contacts with Highland employees therefore did not fall outside the letter of the "shared services" exception, even under the definition Highland has concocted on appeal. Nor did these communications violate the spirit of the TRO, which was meant to prevent Dondero from distracting Seery and the Board or interfering with the reorganization

19

effort, while preserving Dondero's ability to otherwise run his companies. Five isolated emails are not clear and convincing evidence that Dondero distracted anyone at Highland from doing anything.

## II. Dondero did not violate Section 2(d) of the TRO because he did not interfere with any post-TRO securities trades.

Highland fares no better in defending the Bankruptcy Court's determination that Dondero violated Section 2(d) of the TRO by interfering with Highland's trades in SKY and AVYA stocks after the TRO's entry. (Dondero Br. 12, citing ROA.286) Highland admits this determination turned on the Bankruptcy Court's assessment of Dondero's "credibility" (Highland Br. 37)—specifically, the court's rejection of Dondero's testimony at the contempt hearing that "he may have interfered with the Debtor's trades the week of Thanksgiving," before entry of the TRO, "but he did not after entry of the TRO." (Dondero Br. 12, citing ROA.281) And Highland's defense of that determination rests entirely on the premise that the Bankruptcy Court was free, in its role as fact-finder, to disregard that testimony in favor of Dondero's previous testimony from his deposition and a prior hearing unrelated to the TRO— even though that earlier testimony was objectively, demonstrably, and irrefutably mistaken. (Highland Br. 35-37)

But courts may not make credibility determinations based on a "misinterpretation of the evidence." (Dondero Br. 38, quoting *Olson v. Schweiker*, 663 F.2d 593, 596 (5th Cir. 1981)) And Highland admits such a misinterpretation

occurred in this case. The Bankruptcy Court rejected Dondero's contempt hearing testimony that he did not interfere with any post-TRO securities trades on the basis that "[t]he evidence [did] not seem to support" Dondero's story. (ROA.281-82) Yet that "evidence" concerned the wrong time period. As Highland acknowledges, the Bankruptcy Court relied on "events" of interference "occur[ring] before the entry of the TRO," which the Bankruptcy Court erroneously concluded occurred *after* the TRO. (Highland Br. 39) The Bankruptcy Court's credibility assessment therefore hinged on evidence that did not exist.

Highland contends that this obvious mistake was immaterial because the "record as a whole, 'on the entire evidence,'" supports the Bankruptcy Court's conclusion. (Highland Br. 39) But Highland is doubly mistaken. For one thing, under *Olson*, "a credibility choice based on a misinterpretation" of the evidence is "clearly erroneous" *regardless* of whether other evidence would support it, because the mistake invalidates the credibility determination. 663 F.2d at 596. Any attempt to rehabilitate an insupportable credibility determination with different evidence is impermissibly speculative, because there is no reason to believe that the court would reach the same determination under different evidence.

For another, absolutely nothing outside of Dondero's previous mistaken testimony supports Highland's accusation that he interfered with Highland's securities trades after entry of the TRO by "personally instruct[ing] the employees

of the Advisors not to execute them." (Highland Br. 38 n.14) Highland never mentions the evidence it previously relied upon to support that accusation—its own December 23, 2020 letter in response to a "request" from the Advisors' counsel to refrain from the trades (Dondero Br. 37, citing ROA.7203)—because that evidence has proven to be a complete fabrication. And nothing else in the record supports the allegation that Dondero tried to block any trades after the TRO—no texts, no emails, no letters, and no testimony from any securities trader or Highland employee. And this is in stark contrast to the numerous emails that Dondero sent when he admittedly tried to block Highland securities trades before entry of the TRO. (ROA.7029-30, 7696-97, 7701-02)

The very idea behind this theory of interference is also nonsensical. Highland makes a point of explaining that the Advisors have no "right to manage the CLOs" containing the securities; only Highland can "sell the CLOs' assets." (Highland Br. 8) Indeed, when Dondero sought to interfere with Highland's trades before entry of the TRO, he contacted *Highland employees* responsible for making the trades. (Dondero Br. 35, citing ROA.7029-30, 7696-97, 7701-02) Instructing employees of the *Advisors* to block the trades—which is all that Highland asked Dondero about in its questioning (Highland Br. 37)—would accomplish nothing.

Furthermore, Seery confirmed that the post-TRO trades in AVYA and SKY went through without a hitch, further demonstrating that no interference occurred.

(ROA.10149, 10154) Highland responds that "getting caught in the act is no defense." (Highland Br. 39 n.15) But Dondero was never "caught" doing anything—because no such acts occurred in the first place. Seery's testimony is further proof that Dondero's contempt hearing testimony was objectively and unequivocally correct, and his previous testimony was objectively and unequivocally incorrect.

And Highland's attempt to bolster Dondero's now-recanted testimony falls flat. While Dondero gave his mistaken testimony after being presented with an email dated after the TRO informing him of a post-TRO sale of securities by Seery, that does not prove the testimony he gave was correct. He may have simply been confused about the relevant sequence of events surrounding the trades in relation to the entry of the TRO. Or he might have overlooked the date on the email. Either of those errors would be understandable given that the Bankruptcy Court made them too. But regardless of the reason for Dondero's mistake, there is no question he *was* mistaken. And his mistaken testimony cannot overcome the irrefutable evidence that no post-TRO interference occurred.

Accordingly, the evidence compels only one conclusion: Dondero took no action to interfere with any trades after entry of the TRO. The Bankruptcy Court had no ability to conclude otherwise based on an erroneous credibility determination. And because there is no other evidence supporting the finding that Dondero violated

Section 2(d) of the TRO—much less the clear and convincing evidence the law requires—the order of contempt must be reversed.

## III.    The amount of the sanction is excessive and impermissible.

Highland's effort to overcome the numerous flaws in the Bankruptcy Court's massive $450,000 sanctions award are also unavailing.

The first of these flaws concerns the Bankruptcy Court's decision to award Highland fees for work *before* entry of the TRO—and the District Court's affirmance of an award including those fees. (Dondero Br. 39-40) Highland's only response to Dondero's challenge to this improper award is to pretend it did not occur, insisting—for the first time—that the Bankruptcy Court *did not* award pre-TRO fees. (Highland Br. 43-44) But Highland's new position disregards the District Court's explicit holding that the Bankruptcy Court *did* award "fees predating the contemptuous conduct." (ROA.11647) That position also disregards the Bankruptcy Court's description of its own award, which stated that the sanction did include fees "relating to the TRO and Contempt Motion." (ROA.302) That was no "stray reference." (Highland Br. 43) And the fact that the Bankruptcy Court reviewed only the "December" and "January" billing invoices (ROA.302 & n.172, citing Debtor's Exhs. 38 & 39) did not exclude pre-TRO time, as Highland contends (Highland Br. 43). To the contrary, the "December" invoice covered Highland's fees for work done in November, before entry of the TRO on December 10. (*See* Debtor's Ex. 38,

ROA.9068-9113) And the "January" invoice covered Highland's December work (*see* Debtor's Ex. 38, ROA.9114-9156), thus including more pre-TRO time. (ROA.6873). Accordingly, while the Bankruptcy Court's goal in fashioning its sanction may have been to "compensate the Debtor/estate for losses resulting from Mr. Dondero's non-compliance with a court order" (Highland Br. 43, quoting ROA.304, emphasis omitted), the Bankruptcy Court indisputably—and erroneously—included fees related to events occurring before the TRO. That error alone requires reversal of the sanction award.

Highland also cannot explain away the windfall resulting from the Bankruptcy Court's decision to award Highland all the fees it incurred pursuing the contempt motion, despite Highland's success on only two of the six grounds on which it sought contempt. (Dondero Br. 40) Highland offers several responses, but none are availing. It first contends that all the allegations of contempt shared a "common core of facts" or involved "related legal theories," excusing its duty to segregate under *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). (Highland Br. 41) But *Hensley* is applicable only in cases of overlapping "claims for relief," not contempt sanctions involving multiple factual allegations. 461 U.S. at 435. And Highland fails to explain the legal or factual commonality between its *successful* contempt allegations, which involved Dondero's contacts with Highland employees and interference with Highland securities trades, and its *unsuccessful* ones, which differ so widely as to encompass

an alleged failure to "read" the TRO or "listen" during the TRO hearing, "trespassing" on Highland property, throwing away his cell phone to evade discovery, and "interfering" with the UCC's requests for documents on the Dugaboy Trust. (Dondero Br. 7-8, citing ROA.7200-23) Nor does Highland explain how its work on these unsuccessful claims was so connected to its work on the successful ones as to make the former "expended in pursuit of the ultimate result achieved," as *Hensley* requires. 461 U.S. at 435. Accordingly, Highland's duty to segregate cannot be excused.

Nor can Highland excuse its failure to segregate by invoking the supposed "impossib[ility]" of segregating fees related to developing the successful and unsuccessful allegations in its contempt motion. (Highland Br. 42) Highland has never made *any* attempt to show that such segregation is impossible—at trial or on appeal. It simply falls back on the supposed "interrelat[ionship]" between its successful and unsuccessful contempt allegations, which have no such interrelationship. And even if segregation was impossible because the contempt allegations were intrinsically "interrelated," that still would not relieve the Bankruptcy Court from making some kind of discount to the fee award to account for Highland's limited success. (Highland Br. 40, quoting *Roussell v. Brinker Int'l*, 441 F. App'x 222, 333 (5th Cir. 2011) (per curiam)) Indeed, *Hensley* instructs that the "considerations" courts must undertake in exercising their "discretion" in

rendering fee awards include whether "the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate" yields "an excessive amount" for a litigant who "has achieved only a partial or limited success," thus suggesting the award should be reduced. 461 U.S. at 436. But the Bankruptcy Court made none of the required considerations in rendering its sanction.

Requiring the Bankruptcy Court to do so is neither excessively "nit-picky" nor "unworkable." (Highland Br. 42, quoting ROA.11647) It simply requires enforcing the Bankruptcy Court's obligations in rendering fee awards. Indeed, holding the Bankruptcy Court to these obligations is all the more critical given the sheer size of the $450,000 award, which *Topalian v. Ehrman*, 3 F.3d 931, 937-38 (5th Cir. 1993) puts on the extreme high end of sanctions that would be permissible under any circumstances. The Bankruptcy Court's failure to take basic steps to fulfill that obligation is another reason the award must be reversed.

Finally, Highland's failure to provide any proof of the reasonableness of its fees creates yet another fatal problem. (Dondero Br. 42, citing *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013)) Highland tries to elide that requirement by comparing the voluminous billing records it produced to the relatively sparce proof offered in some of the cases Dondero has cited. (Highland Br. 45, citing *Wegner v. Standard Ins.*, 129 F.3d 814 (5th Cir. 1997); *Payne v. Univ. of S. Miss.*, 681 F. App'x 384 (5th Cir. 2017) (per curiam)) But both *Wegner* and *Payne* stand for the

proposition that proof of the *amount* of the fees through billing records is only half the equation in supporting a fee award—the other half requires proof of the *reasonableness* of the fee. The existence of that proof was the determinative factor in the Court's decisions in those cases. (Dondero Br. 42) And its absence is fatal to the award in this case.

## CONCLUSION

For the reasons stated above and in Dondero's opening brief, the Bankruptcy Court's order of contempt and sanction of $450,000, and the District Court's affirmance of that order and award, should be reversed.

Respectfully submitted,

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**
jlevinger@levingerpc.com
**J. Carl Cecere (of counsel)**
ccecere@cecerepc.com
**Levinger PC**
1700 Pacific Ave., Suite 2390
Dallas, Texas 75201
Telephone: 214-855-6817
Facsimile: 214-817-4509

*Attorneys for Appellant*
*James Dondero*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 24, 2023, the foregoing Appellant's Reply Brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the Appellate CM-ECF System. Participants in this case who are registered CM-ECF users will be served electronically by the Appellate CM-ECF System. Other participants will be served by e-mail.

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

## CERTIFICATE REGARDING PRIVACY REDACTIONS AND VIRUS SCANNING

The undersigned certifies that: (1) all required privacy redactions have been made in this brief, in compliance with 5TH CIR. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, in compliance with 5TH CIR. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.  This reply brief complies with the type-volume limit of FED. R. APP. P. 32 (a)(7)(B) because, excluding the parts of the reply brief exempted by FED. R. APP. P. 32(f):

    ☒    it contains 6,474 words.

2.  This reply brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because:

    ☒    it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14 pt. Times New Roman (and 13 pt. for footnotes).

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

*Attorney of Record
for Appellant James Dondero*

March 24, 2023